[No. B068266. Second Dist., Div. Three. Jan. 30, 1995.]

RICARDO C. ESPINOSA, JR., a Minor, etc., Plaintiff and Appellant, v. LITTLE COMPANY OF MARY HOSPITAL et al., Defendants and Respondents.

## COUNSEL

Lund & Caplan, Richard A. Caplan and Janice M. Corsino for Plaintiff and Appellant.

Rushfeldt, Shelley & Drake, Kathryn S. M. Mosely, Horvitz & Levy, David M. Axelrad, Mary F. Dant, Baker, Silberberg & Keener, Steven R. Van Sicklen and Natasha M. Riggs for Defendants and Respondents.

## OPINION

**CROSKEY, J.**—This is an appeal from a judgment of nonsuit entered in a medical malpractice action. Plaintiff Ricardo C. Espinosa, Jr., brought this action through his guardian ad litem for brain damage allegedly sustained by him due to the negligence of defendants Little Company of Mary Hospital (Hospital), which performed certain prenatal care and testing, and Dr. Michael L. Friedman who was the delivering obstetrician.

The case was tried to a jury where plaintiff proceeded on the theory that defendants' negligence in performing the prenatal care and delivery of plaintiff was a substantial factor in causing him to be born with significant brain damage. After several days of testimony, the trial court, apparently satisfied that plaintiffs' expert witnesses had not sufficiently established the element of causation between defendants' acts and plaintiff's brain damage, granted a motion for nonsuit.

After an examination and consideration of the causation evidence presented by plaintiff, and with due regard to the proper standard to be applied in the review of a judgment of nonsuit, we are satisfied that plaintiff did present sufficient evidence to go to the jury on this issue. We therefore reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Viewing the record, as we must, in the light most favorable to plaintiff,[1] the following facts are presented.

Plaintiff's mother became a patient of Dr. Friedman, a board certified obstetrician and gynecologist, on June 27, 1983; she was then 19 weeks pregnant. During the first trimester of her pregnancy, and prior to the time when she knew she was pregnant, plaintiff had taken six to eight doses of the drug Lithium.[2]

Dr. Friedman examined plaintiff's mother and gave her an estimated due date of November 18, 1983. On that date, he again examined her and determined that her pregnancy was 40 weeks. Dr. Friedman found the cervix closed at this time. Due to the extended length of the pregnancy she was given a nonstress test on November 22, 1983. This is a test to ascertain the well-being of the baby. That test revealed a prolonged, slow drop in the baby's heart rate. Dr. Myra Levinson, M.D., an expert witness in obstetrics, testified that this drop was "suspicious," and that other decelerations in the heart rate indicated that something was happening to the oxygen supply of the baby such that it was temporarily being cut off.

According to Dr. Levinson, in light of the fact that the mother was slightly overdue and there was an indication that the baby possibly was not alright, "the decision should have been made to deliver the baby" at the time of this first nonstress test. Dr. Levinson testified there was no other alternative

---

[1] The review of a judgment of nonsuit requires us to give to plaintiff's evidence all of the value to which it is legally entitled and to indulge in every legitimate inference which may be drawn from that evidence. (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839 [206 Cal.Rptr. 136, 686 P.2d 656].)

[2] The evidence at trial indicated that Lithium taken during a pregnancy has been implicated in causing heart defects and other abnormalities in the fetus. However, there is no claim in this case that plaintiff's heart was damaged or is anything other than normal. Nonetheless, plaintiff's own expert concedes that the injuries sustained by plaintiff were at least partially caused by his mother's ingestion of Lithium. There is no claim that defendants were in any way responsible for the mother's use of Lithium.

course short of that. By inference, the failure to deliver at this time was below the standard of care, and was negligence.[3]

Following the nonstress test, on the same day, an oxytocin challenge test was done. This is a test in which the mother is administered oxytocin or pitocin, a medication similar to that released by the brain in labor which causes the uterus to contract. The resulting contractions produce a stress on the baby, and the baby's reaction to the stress can be ascertained and evaluated. This test also demonstrated drops in the baby's heart rate.

Dr. Levinson testified that the conduct of Hospital's nurse employees during these tests was negligent in failing to recognize the decelerations in the baby's heart rate, and in taking the mother off the monitor while the baby's heart rate was still having decelerations.

Four days later, on November 26, 1983, Mrs. Espinosa was admitted to the outpatient obstetrical area of Hospital at 9 a.m. for a repeat nonstress test. Again, there were drops in the baby's heart rate. Dr. Friedman was not present during any part of this test, and had no further contact with Mrs. Espinosa until some 33 hours later, at 7:30 p.m. the next day.

Dr. Levinson testified that in light of the fact that Mrs. Espinosa was eight days overdue, that there had been a prior nonstress test with decelerations, and there were more decelerations on this test, the conduct of Hospital's nurses was below the standard of practice in that they let Mrs. Espinosa go home without reporting to the doctor about the decelerations.

Dr. Levinson was also critical of Dr. Friedman's failure to act to deliver the baby at this time, either by cesarean section or induced labor. Dr. Levinson reiterated that there was no reason to have waited past the date of the first nonstress test, i.e., November 22, and certainly no justification to wait beyond November 26.

About 7 p.m. on November 27, 1983, Dr. Friedman gave a telephone order to Leila Hall, a labor and delivery nurse at Hospital, to admit Mrs. Espinosa to the labor and delivery area, to type and cross match her for blood (standing orders for a patient who might need a cesarean section), and to obtain an X-ray.

Mrs. Espinosa arrived at the labor and delivery department at 7:10 p.m. The baby was delivered by cesarean section at 8:22 p.m. that evening. Dr.

[3] As we explain below, the issue before us relates only to causation, the perceived absence of which was the *sole* basis for the nonsuit. We assume without deciding that sufficient evidence of defendants' negligence was presented. We nonetheless discuss the standard-of-care evidence in order to give context to our consideration of the causation issue.

Friedman noted a pre- and postoperative diagnosis of a forty-one-and-one-half-week pregnancy with breach presentation, four-plus meconium and significant fetal distress. Meconium is fetal bowel contents and its presence in the amniotic fluid is interpreted by doctors as a sign of fetal distress in utero. In this case, because the meconium was so thick, the passage was probably relatively fresh, with eight to twelve hours prior to delivery being a reasonable estimate of when it was passed.

Dr. Anne Marie Morris, a neonatologist present at the delivery, noted the presence of "thick pea soup meconium" in the amniotic fluid, "fetal distress noted on monitor," and a breach presentation. Meconium was found below the level of the vocal cords in the baby's trachea. The meconium was so thick that three endotracheal tubes had to be inserted and suctioned to clear the airways.

Plaintiff called Dr. Ronald Gabriel, a pediatric neurologist, who testified at length about the injuries to plaintiff and the resulting impairment; and, most important, he provided plaintiff's only evidence as to causation which is central to the issues raised in this appeal.

Dr. Gabriel described plaintiff's injuries in terms of diffuse mental and motor abnormalities which resulted from structural damage to the brain. He testified that plaintiff, who at the time of trial was eight years old, presented this brain damage through a number of symptoms or conditions. "He [plaintiff] has very significant cognitive and language and psycho-social retardation. . . . He doesn't understand his environment, and he is easily frightened, and he does not have any words that make sense. . . . [H]e [is] somewhat awkward and clumsy. . . . [H]e has a mild degree of choreoathetotic posturing which . . . is a sign of involvement of the motor system. . . ."

When asked to describe for the jury the diagnostic conclusion which he had reached following his examination of plaintiff, Dr. Gabriel testified, "This child has an organic encephalopathy which means there is brain pathology due to structural reasons. There is brain damage, and it's characterized by involvement of the nerve tracts that supply the arms and legs and the motor function of the face, and it also involves the tracts responsible for coordination and reflex activity, and, in particular, it involves those parts of the brain that are responsible for intelligence, for language, and for proper behavior . . . . [He] demonstrates a variety of findings, affective, which means behavioral, cognitive, which means intelligence, language and motoring consistent with structural pathology, i.e., brain damage, of the central nervous system. [¶] I found it to be diffuse and bilateral involving both cerebral hemispheres."

Dr. Gabriel was asked to express his opinion as to the cause or causes of plaintiff's brain damage. He testified, "I believe there are factors that occurred early in pregnancy, which I labeled chronic fetal distress, and there are factors that occurred in a sub-acute time frame, which was shortly before mother presented to the hospital for labor and delivery, and there are factors which I call acute fetal distress which occurred during labor and delivery and immediately thereafter. [¶] *So we have three time frames in terms of the factors that are involved in causing this child's condition, chronic, sub-acute and acute.*" (Italics added.)

Dr. Gabriel identified the mother's use of Lithium early in pregnancy as one of the factors belonging to the first or chronic time frame. The second, or subacute, was identified as including the first and second nonstress tests, regarded by Dr. Gabriel as abnormal, and marked by decelerations, reduced beat to beat variability in the baby's heart rate, and passage of meconium, probably about four to twelve hours prior to delivery. The acute phase was identified as the labor and delivery, marked by fetal monitoring abnormalities, the need for emergency cesarean section, the baby's breach position with the umbilical cord wrapped around his neck three times, and a number of abnormalities of function and development during the newborn period.

Dr. Gabriel conceded that the mother's ingestion of Lithium did "play[] a contributory role" in causing plaintiff's condition and that at least a portion of plaintiff's current condition was Lithium related.[4] However, he could not quantify it, that is, he could not say whether it played an 80 percent or a 10 percent part of plaintiff's impaired language, psychosocial and cognitive dysfunction; nor could he quantify the interrelationship of the chronic, subacute and acute phases.

He stated that during the acute phase there were three mechanisms that caused brain damage, these being (1) direct trauma to the head, (2) reduced blood flow to the head and (3) acute transient asphyxia. These mechanisms, which occurred during the labor and delivery, were described as "pathogenetic" or mechanisms that caused brain damage.

He testified that the subacute and acute phases were "substantial factors in the outcome," and that they "had a contributory role in the outcome of a substantial nature because they reflect three mechanisms[:] The mechanism

---

[4]He emphasized that there was no direct evidence that prenatal ingestion of Lithium affects the brain, but there is evidence it affects the heart, the palate and possibly certain facial features. He expressed the view that Lithium "is a contribution, although we don't have any direct evidence that Lithium does affect the brain." Dr. Gabriel further opined, ". . . whatever happened in early pregnancy from the Lithium[] did not continue on in terms of its adverse effect on the baby."

of trauma, the mechanism of reduced blood flow or reduced profusion, and the mechanism of acute transient asphyxia." He stated that these three mechanisms "can produce brain damage singularly or in combination," and in his opinion, "we have a combination of all three impacting upon this child during the last 33 and some odd hours before entry to the hospital and during the final stages of labor and delivery, which coalesce to produce what we see today."

The results of the brain damage sustained by plaintiff were described by Dr. Gabriel. Plaintiff's life expectancy would be three quarters of normal. He stated that plaintiff will always be dependent, requiring a shelter within the home, and later, when that is not possible, within a residential facility. Plaintiff will require help with all activities of daily living, such as cooking, dressing and toilet needs; and will never be able to hold an occupation or earn a living; will always require psychological support, and "essentially will be a dependent child and adult throughout his life." Rehabilitation, including special education would be necessary. In addition, plaintiff will need either behavior modification or drug therapy to control his behavior.

After several days of trial, both Hospital and Dr. Friedman made a motion for nonsuit on the issue of causation which the trial court granted. In granting that motion the trial court assumed that sufficient evidence had been presented to demonstrate that both Hospital and Dr. Friedman had breached the appropriate standards of care. As the court later put it in its order denying plaintiff's new trial motion, ". . . the motion for non-suit was based only upon the ground that insufficient evidence was in the record on the causation issue and it was not addressed to the issue of negligence."

Judgment was thereafter entered in favor of defendants and plaintiff's timely appeal followed.

### ISSUE PRESENTED

██  The single issue presented by this appeal is whether plaintiff presented sufficient evidence on the issue of causation to permit the dispute to be resolved by the jury. Each defendant argues that sufficient evidence was lacking to demonstrate that the conduct of either of them legally caused the injury sustained by plaintiff.[5] Plaintiff counters by insisting that this record does contain sufficient evidence on causation and that he was improperly deprived of his right to a jury resolution of the issue.

---

[5] A substantial portion of the argument raised by Hospital is that the evidence of substandard performance on the part of its nurses was devoid of any sufficient showing that their acts or omissions caused any particular injury to plaintiff. We have reviewed the record with respect to these contentions and believe that such arguments are really factual in nature and

Discussion

### 1. *Standard of Review*

■ "A motion for nonsuit allows a defendant to test the sufficiency of the plaintiff's evidence before presenting his or her case. Because a successful nonsuit motion precludes submission of plaintiff's case to the jury, courts grant motions for nonsuit only under very limited circumstances. [Citation.] A trial court must not grant a motion for nonsuit if the evidence presented by the plaintiff would support a jury verdict in the plaintiff's favor. [Citations.] [¶] 'In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give "to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff['s] favor . . . .' " [Citations.] [¶] ■ In an appeal from a judgment of nonsuit, the reviewing court is guided by the same rule requiring evaluation of the evidence in the light most favorable to the plaintiff. 'The judgment of the trial court cannot be sustained unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' [Citations.] [¶] Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is 'some substance to plaintiff's evidence upon which reasonable minds could differ . . . .' [Citations.]" (*Carson* v. *Facilities Development Co.*, *supra*, 36 Cal.3d at pp. 838-839.) " 'If the existence of facts sufficient to support a recovery can logically and reasonably be inferred from the evidence, the motion must be denied, regardless of whether the evidence is also susceptible to conflicting inferences. [Citation.] . . . . *When there is doubt in the court's mind about the inferences that may reasonably be drawn from the evidence it is the duty of the court to let the case go to the jury.* [Citations.]' [Citation.]" (*Ashcraft* v. *King* (1991) 228 Cal.App.3d 604, 611 [278 Cal.Rptr. 900], italics added.)

### 2. *The "Substantial Factor" Test for Causation*

■ In cases alleging negligence, the proper test for proving causation is the one set out in BAJI No. 3.76 (8th ed. 1994 bound vol.): "The law defines

---

would be better addressed to a jury than to this court. We therefore focus in this opinion on the broader causation issue which is raised by the reasoning of the trial court on which it relied in granting a nonsuit.

cause in its own particular way. A cause of injury, damage, loss or harm is something that is a substantial factor in bringing about an injury, damage, loss or harm." (See also *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1052-1053 [1 Cal.Rptr.2d 913, 819 P.2d 872].)

Unfortunately, we do not have much guidance as to what the term "substantial" means. The Supreme Court, in *Mitchell* v. *Gonzales, supra,* did not attempt to define the term. However, in an earlier criminal case, that court quoted the following language with approval: " 'No cause will receive juridical recognition if the part it played was so infinitesimal or so theoretical that it cannot properly be regarded as a *substantial factor* in bringing about the particular result.' " (*People* v. *Caldwell* (1984) 36 Cal.3d 210, 220 [203 Cal.Rptr. 433, 681 P.2d 274], italics in original.) We agree with the comment of the BAJI Committee, which took its cue from *Caldwell* when it noted, "While there is no judicially approved definition of what is a substantial factor for causation purposes, it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result." (Com. to BAJI No. 3.76 (8th ed. 1994 bound vol.) p. 99.)

As another court put it, relying heavily upon the Restatement of Torts, "However the test is phrased, causation in fact is ultimately a matter of probability and common sense: '[A plaintiff] is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise. If, as a matter of ordinary experience, a particular act or omission might be expected to produce a particular result, and if that result has in fact followed, the conclusion may be justified that the causal relation exists. In drawing that conclusion, the triers of fact are permitted to draw upon ordinary human experience as to the probabilities of the case.' [Citation.] [¶] . . . . Conduct can be considered a substantial factor in bringing about harm if it 'has created a force or series of forces which are in continuous and active operation up to the time of the harm' [citation], or stated another way, 'the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another' [citation]." (*Osborn* v. *Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 253 [7 Cal.Rptr.2d 101].)

3. *Application of the "Substantial Factor" Test in Medical Malpractice Actions*

■  In a medical malpractice action the element of causation is satisfied when a plaintiff produces sufficient evidence "to allow the jury to infer that

in the absence of the defendant's negligence, there was a *reasonable medical probability* the plaintiff would have obtained a better result. [Citations.]" (*Alef* v. *Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 216 [6 Cal.Rptr.2d 900], italics added.)

This rule was applied in *Alta Bates* to support the court's decision to reverse a judgment of nonsuit in a case very similar to the one before us. There a brain-damaged minor brought an action to recover for the defendant's negligent monitoring of the plaintiff in his mother's womb. The defendants had failed to recognize signs of fetal distress and the delayed delivery resulted in brain damage to the plaintiff.

The *Alta Bates* court referred to evidence by the plaintiff's experts that his brain damage was caused by hypoxia occurring prior to delivery, with fetal distress demonstrated by decelerations in the fetal heart rate which should have aroused concern of danger to the fetus. On this record, the court observed, "From the foregoing evidence, the jury could have concluded that negligent monitoring failed to detect fetal distress during the relevant period prior to delivery and, as a result, no attempt was made to intervene to advance delivery prior to the onset of permanent brain damage." (5 Cal.App.4th at p. 217.)

In this case, plaintiff's experts testified that there was substandard monitoring which failed to recognize and promptly respond to fetal distress, and although plaintiff should have been delivered when those signs occurred, that delivery was delayed. There was further expert testimony that the events which occurred during the period of delay were a substantial factor and contributing cause to plaintiff's brain damage.

On this record, just as in *Alta Bates*, the jury could have concluded that the negligent monitoring resulted in a failure to deliver plaintiff in time to prevent permanent brain damage. The jury could also properly have concluded that while prenatal ingestion of Lithium may have contributed to the result, in the absence of defendants' negligence it was reasonably probable that plaintiff would have obtained "*a better result.*" Indeed, if Dr. Gabriel's testimony is accepted as true, it is reasonable to conclude that plaintiff would have achieved a better result if he had been delivered when Dr. Levinson testified he should have been.

### 4. Application of "Substantial Factor" Test Here Where Multiple Causes of Plaintiff's Injury Exist

In discussing the problem of multiple causes one court stated, "The law is well settled that in a personal injury action causation must be proven

within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. [Citations.] That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury. [Citation.]" (*Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402-403 [209 Cal.Rptr. 456].)

As the trial court here recognized, the state of the evidence in this case demonstrated that plaintiff's brain damage resulted from multiple causes. Actually, it appears that there were three separate, apparently interacting, causes: ingestion of Lithium by plaintiff's mother early in her pregnancy, the negligent monitoring and reporting activity of Hospital and the negligence of Dr. Friedman. Only the latter two circumstances are chargeable to defendants. It was the trial court's view that plaintiff's evidence failed to demonstrate which of these disparate acts had "caused" which of plaintiff's injuries.[6]

We believe the trial court erred in both its methodology and in its conclusion. On this record, we are satisfied that the evidence demonstrated that plaintiff suffered from a single indivisible injury, that is, brain damage. While the evidence reflected that there were three causes for this tragic result, defendants had clear responsibility for two of them. The evidence also shows that defendants' negligence was a substantial factor in bringing about the end result.

---

[6]Specifically, the trial court described its reasoning in its lengthy order denying plaintiff's new trial motion: "The crux of the situation is that we are dealing with concurrent causation that involves complex medical issues. This is not a simple automobile accident where the jury is able to use their own common sense and experience to balance the facts relating to concurrent causation. It is for this reason that 'causation must be proven within a reasonable medical probability based upon competent expert testimony.' (*Jones, supra*[,] at [p.] 402[.]) The evidence does not address whether the alleged hypoxia and the damage caused by the [L]ithium caused 'the injury' or whether they caused separate injuries. The evidence does not establish whether or not the effects of the ingestion of [L]ithium and the hypoxia were 'operative at the moment of injury' assuming they caused the same injury. The evidence is clear that the ingestion of [L]ithium occurred in the first trimester and that the hypoxic event attributed to the defendants occurred in the last seven days. It is entirely possible, based on evidence adduced in plaintiff['[]s case-in-chief, that the brain damage to [plaintiff] had occurred prior to the hypoxic event. If that is so the effects cannot be attributed to the defendants. The jury had no guidance on this issue by plaintiff's expert. It is for this reason that the Court granted the non-suit."

Dr. Gabriel testified that trauma, profusion failure and transient asphyxia (events attributable to the delay caused by defendants' negligence) played a part in the plaintiff's condition. Moreover, Dr. Gabriel identified with specificity the brain damage caused by events in the subacute and acute time phases which contributed substantially to cause the outcome.

Dr. Gabriel described specific evidence of structural brain damage caused by hypoxia and trauma in the subacute and acute phases, including diffuse cortical atrophy, increased markings over the surface of his brain, and evidence of diffuse atrophy over the hemispheres. He testified that an MRI test showed a failure of growth of the brain and a degree of cortical atrophy which *did not* occur in early pregnancy. Dr. Gabriel testified that an MRI showed breakage of axons in the cortical medullary junction, an area particularly vulnerable to trauma.

This is evidence of damage to specific structures in the brain caused by direct physical trauma or traumatic encephalopathy, which is attributable to the actions or omissions of defendants in the subacute and acute phases, and is not attributable to Lithium. Dr. Gabriel denied that these abnormalities, seen on the 1985 MRI, were consistent with malformation in the first trimester. In other words, the brain damage shown in the MRI films is *not* attributable to Lithium, and is related to the actions or inactions of defendants.

Dr. Gabriel testified that trauma and reduced blood flow to the head, and acute transient asphyxia were "pathogenetic" mechanisms which caused plaintiff's brain damage. He testified without equivocation that the subacute and acute phases were "substantial factors in the outcome," and that they "had a contributory role in the outcome of substantial nature" because they reflect the three brain-damage producing mechanisms of trauma, reduced blood flow and acute transient asphyxia.

While Dr. Gabriel did state that he could not quantify the part Lithium played in producing plaintiff's impairments, it is clear from his testimony that he regarded all three causal factors as being substantial, contributory and essential to produce the ultimate outcome. It was clear from Dr. Gabriel's testimony that Lithium was responsible for only a portion of plaintiff's current disabilities stemming from his permanent structural brain damage.

Given this testimony, that defendants' conduct was a substantial factor in bringing about the outcome, Dr. Gabriel's inability to pin down the exact extent to which defendants' conduct contributed to the outcome is immaterial for purposes of *causation.* Clearly, where a defendant's negligence is a

concurring cause of an injury, the law regards it as a legal cause of the injury, *regardless of the extent to which it contributes to the injury.*[7] (BAJI No. 3.77.)

Dr. Gabriel did not testify that it was *possible* that the subacute and acute phases caused brain damage. He testified that they *did* cause brain damage. He did not testify that it was *possible* that the subacute and acute phases were substantial factors in causing plaintiff's brain damage. He testified that they *were* substantial factors in causing the outcome.

To reason, as did the trial court, that based on plaintiff's evidence, "[i]t is entirely possible . . . that the brain damage to [plaintiff] had occurred prior to the hypoxic event . . ." is simply not justified or supported by Dr. Gabriel's testimony. Dr. Gabriel identified specific brain damage on plaintiff's MRI study which was not caused during the first trimester, but rather, was caused by trauma, and testified that the events surrounding the labor and delivery were substantial factors in causing plaintiff's condition.

On nonsuit, plaintiff's evidence must be interpreted in the fashion *most favorable* to plaintiff, not the reverse. Viewed in the proper light, plaintiff's evidence showed that it was more probable than not that defendants' actions were *a* cause of plaintiff's brain damage.

### 5. The Trial Court Erred in Applying the "50% Factor" Rule

While recognizing the principle that a concurrent tortfeasor can be liable for the whole of an indivisible injury, the trial court failed to apply that principle. At the time it granted defendants' motion, the trial court acknowledged that "[t]here is evidence in the record that the taking of Lithium by the mother was a substantial factor, *and that the fetal distress was a substantial factor.*" (Italics added.) However, it then went on to apply rules developed in the so-called cancer cases to support the conclusion that plaintiff's causation evidence had fallen short. The court stated, "the problem is there has to be further evidence to show that the fetal distress was more than a 50 percent factor in the causing of the brain damage to [plaintiff] as compared to the minor motor difficulty. . . . [¶] What the cancer cases say where there is a fault not attributable to the defendant in the lawsuit, the experts must testify

---

[7]Dr. Gabriel was asked to assume that if the Lithium was taken out of the equation, could he then say that plaintiff would not be an employable, productive human being. His reply demonstrates that those factors for which defendants are responsible were not trivial in bringing about the end result, but rather were necessary: "On the contrary. You recall there are two other crucial factors. [¶] Trauma, which I think is a contributory component and reduced profusion from strangulation which I think is the second contributory component that impacted upon this child's function, as you see it today."

on the proximate causation, that is the fault of the defendants that is more than 50 percent responsible for the injury attributed to the defendant and not to the original fault of the cancer. [¶] Here Dr. Gabriel says that the mother took Lithium. He can not tell us what percentage was caused by the Lithium or what percentage was caused by the fetal distress. That is a failure of proof. [¶] That is the whole crux and that is why the cancer cases are dead on point."

The trial court appears to rely to some extent on the lost-chance cases in which the plaintiff has sought medical care for a preexisting disease or injury. In such cases, the result complained of in the lawsuit is one which would normally have been expected to follow from the original injury or disease, rather than from any effects of misdiagnosis or mistreatment. (*Dumas* v. *Cooney* (1991) 235 Cal.App.3d 1593, 1603 [1 Cal.Rptr.2d 584]; see also *Bromme* v. *Pavitt* (1992) 5 Cal.App.4th 1487 [7 Cal.Rptr.2d 608].) To prove the defendant's negligence was a substantial factor in causing the plaintiff's condition in such cases, the plaintiff must present expert testimony that if proper treatment had been given, a better result would have followed. (See *Dumas, supra*, at p. 1603.)

In *Bromme* v. *Pavitt, supra*, 5 Cal.App.4th 1487, the husband of a woman who died of colon cancer brought a wrongful death action against a physician who had negligently failed to detect the cancer. The court held that a nonsuit had been properly granted where the evidence demonstrated that by the time the physician first saw the deceased she already had a less than 50 percent chance for survival. Thus, it was more probable than not that she would have died from the cancer irrespective of the defendant's negligence. (*Id.*, at pp. 1499-1500.) To put it another way, the plaintiff had failed to prove within a *reasonable medical probability* that the physician's negligence had caused his wife's death. Under these circumstances the lost-chance cancer cases, such as *Bromme*, hold that the defendant's alleged negligence could not be a substantial factor in bringing about the death of the patient. That is not the situation presented here.

Plaintiff's brain damage is not a result which would normally have been expected to follow from Lithium ingestion in the early stages of pregnancy. Dr. Gabriel stated there is "*no direct evidence*" that Lithium affects the brain. He testified, a 1991 MRI test showed plaintiff's brain atrophy did not occur in early pregnancy, when the Lithium was taken. The effects of the drug did not appear to Dr. Gabriel to have continued throughout the pregnancy. In fact, had no Lithium been ingested, Dr. Gabriel testified, plaintiff would still have sustained the kind of damage he now suffers. The record does not support the conclusion that plaintiff presented defendants with Lithium-induced brain damage which was merely exacerbated by defendants' actions or omissions. This is not a lost-chance case.

In its ruling, the trial court relied primarily on *Jones* v. *Ortho Pharmaceutical Corp.*, *supra*, 163 Cal.App.3d 396, not a malpractice case, to reach its decision on causation. In *Jones*, the plaintiff brought an action to recover damages for cancer she suffered allegedly as a result of taking a contraceptive pill developed and manufactured by the defendant company. However, *Jones* is distinguishable for the very reason that it concerns causes of cancer which are yet unproven.

The etiology of cancer is mysterious and largely unknown, rendering "the question of causation . . . especially troublesome . . . . Under the present state of scientific knowledge . . . it is frequently difficult to determine the nature and cause of a particular cancerous growth. . . . '[F]rom what we know about cancer and drugs it is very difficult to say that there is a clear cause and effect between almost anything or any drug or any toxin and carcinoma. . . .' " (*Jones* v. *Ortho Pharmaceutical Corp.*, *supra*, 163 Cal.App.3d at p. 403.)

Given this lack of knowledge about the connection between some toxins and cancer, causation must be proven by circumstantial evidence. The *Jones* court observed, " '[I]n the absence of factual circumstances of probability understandable to a jury there must be some scientific testimony that can be interpreted as an *inference of hypothetical probability* before we can allow a jury to speculate upon the rights of citizens. [¶] . . . . [O]nce the theory of causation leaves the realm of lay knowledge for esoteric scientific theories, the scientific theory must be more than a possibility to the scientists who created it.' " (*Jones* v. *Ortho Pharmaceutical Corp.*, *supra*, 163 Cal.App.3d at p. 403, italics added.) That is, the plaintiff's experts must perforce testify, based on observation, scientific experiment and statistical comparison, that the chemical in question more likely than not caused the cancer.

Here, testimony about the statistical risk or likelihood of brain damage was not necessary to a prima facie case. Causation was shown *directly*. Dr. Gabriel testified the brain damage was the result of discrete, known factors, not possibly the consequence of myriad variables. Reliance on *Jones* to require plaintiff to produce a statistical probability was misplaced.

As a further distinction, in *Jones*, the plaintiff's experts were unable to make the required showing. The causal connection between the drug and Jones's condition was something less than a 50-50 possibility. It was equally probable that the development of the carcinoma was the result of a cause for which the defendant was not responsible. (*Jones* v. *Ortho Pharmaceutical Corp.*, *supra*, 163 Cal.App.3d at p. 404.) The court held such "uncertain and speculative" evidence was insufficient to establish a prima facie case of

causation between the drug and the cancer and, on that ground, granted the defendant's motion for nonsuit. (*Ibid.*)

Unlike *Jones*, the testimony of plaintiff's expert witness, viewed in its most favorable light, was unequivocal. Dr. Gabriel concluded that defendants' negligent acts, while not the sole cause of plaintiff's brain damage, were clearly a *substantial factor* in causing them. Such testimony was not uncertain or speculative; and it was sufficient to present a prima facie case of causation.

### 6. *It Is Not Plaintiff's Burden to Apportion Damages Among Multiple Causes*

Having demonstrated the substantial factors in causing plaintiff's brain damage, it was not necessary that plaintiff prove any particular apportionment as was required by the trial court. The applicable rule is clearly set out in BAJI No. 3.77: "There may be more than one cause of an injury. When [[negligent] [or] [wrongful] conduct of two or more persons] [or [[negligent] [or] [wrongful] conduct and a defective product]] contribute[s] concurrently as [a] cause[s] of an injury, [the conduct of] each is a cause of the injury *regardless of the extent to which each contributes to the injury.* A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury. [It is no defense that the [negligent] [wrongful] conduct of a person not joined as a party was also a cause of the injury.]" (Italics added.)

In *Hughey v. Candoli* (1958) 159 Cal.App.2d 231 [323 P.2d 779], a pregnant woman was injured in an automobile accident and shortly thereafter delivered a severely oxygen-deprived baby who died. The plaintiff offered evidence showing that a traumatic separation of the placenta had reduced the oxygenated blood flowing to the baby. The defendants countered with evidence that the baby had a congenital malformation of the heart. Even if true, the court held, this only proved that there were two causes of the baby's death. "If it were conceded that defendant had established as matter of law that congenital heart disease was a cause of death of this baby, that did not preclude a recovery by plaintiffs, for defendant's proof showed two concurring causes, atelectasis and heart disease. Assuming that the heart defect was prenatal and in no wise affected by the accident, it nevertheless appears that that was not true of the atelectasis. We have then concurring proximate causes, one of which flowed directly from the negligence of defendant. In this situation the concurrence of the nontortious cause does not absolve defendant from liability for the tortious one." (*Id.*, at p. 240.)

■ A plaintiff does not have the burden of apportioning damages. It is only necessary that a plaintiff demonstrate that the negligence of the defendant was *a* substantial factor in causing the claimed injury. ■ This was

the clear import of Dr. Gabriel's testimony. It was error to reject that testimony simply because Dr. Gabriel was unwilling to put an apportionment percentage on the contribution made by defendants' actions. ▮▮▮ "One who contributes to damage cannot escape liability because the proportionate contribution may not be accurately measured." (*City of Oakland* v. *Pacific Gas & E. Co.* (1941) 47 Cal.App.2d 444, 450 [118 P.2d 328].) This is not a novel principle of law but rather is one which is well established. (*Austin* v. *Riverside Portland Cement Co.* (1955) 44 Cal.2d 225, 234 [282 P.2d 69]; *Puckett* v. *Sullivan* (1961) 190 Cal.App.2d 489, 496 [12 Cal.Rptr. 55, 87 A.L.R.2d 704]; *Cummings* v. *Kendall* (1940) 41 Cal.App.2d 549, 558-559 [107 P.2d 282].)

▮▮▮ When the trial court concluded that plaintiff was required to prove that defendants' conduct was a greater than 50 percent factor in causing his brain damage it confused the issue of damage apportionment, which was not plaintiffs' burden, with the requirement which plaintiff did successfully satisfy, which was to provide evidence that defendants' negligence, to a reasonable medical *probability*, was *a* cause of plaintiff's damage. As the trial court imposed on plaintiff a burden he did not have to bear, the judgment of nonsuit was improper and cannot stand.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for further proceedings consistent with the views expressed herein. Plaintiff shall recover his costs on appeal.

Klein, P. J., and Collins, J.,* concurred.

A petition for a rehearing was denied March 1, 1995, and respondents' petition for review by the Supreme Court was denied April 19, 1995.

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.