Filed 1/29/15; pub. order 2/20/15 (see end of opn.)


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| PATRICK URIELL, Individually and as Trustee, etc. et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, <br><br> Defendant and Appellant. | D064098 <br><br><br> (Super. Ct. No. 37-2011-0091600-CU-PO-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, William S. Dato, Judge.  Affirmed.


Carroll, Kelly, Trotter, Franzen, McKenna & Peabody; John C. Kelly, David P. Pruett and Natalie J. Buccini for Defendant and Appellant.

Niddrie Fish Addams and David A. Niddrie; Cynthia Chihak & Associates and Cynthia Chihak for Plaintiffs and Respondents.

INTRODUCTION

A jury found the University of California San Diego Medical Center (UCSD) failed to timely diagnose Barbara Kastan's breast cancer in 2007 resulting in her death in 2010. The Regents of the University of California (Regents)[1] appeal the wrongful death judgment in favor of Kastan's husband and children contending:  (1) plaintiffs' expert lacked foundation for his opinion there was a reasonable medical probability Kastan would have survived 10 more years if she had been timely diagnosed and (2) the court failed to properly instruct the jury on the issue of causation when it gave the standard substantial factor jury instruction rather than a special instruction regarding proof of causation to "a reasonable medical probability."  We disagree with both contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A

Kastan had an extensive family history of breast cancer.  Her mother was diagnosed with breast cancer in her early 50s and died at age 68 or 69, approximately 18 years after she was diagnosed.  Kastan's mother's aunt died of breast cancer.  In addition, Kastan's paternal grandmother and 10 great aunts all died of breast cancer.[2]

---

[1]    The University of California is administered by the Regents.  (Cal. Const., art. IX, § 9.)

[2]    Uriell prepared a diagram indicating Kastan's family history of breast cancer based on family reports and death certificates.  At the time of trial, there were only three relatives for whom he was not able to obtain death certificates confirming the causes of death.

In the summer of 2007, Kastan's husband, Patrick Uriell, found a lump deep in Kastan's left breast the size of an eraser on a pencil. It was firm and did not move. Because of her family history, Kastan was concerned and obtained an appointment with a doctor as quickly as she could.

Kastan saw a family practice physician at UCSD who palpated a two centimeter hard lump. The physician ordered a mammogram and ultrasound, which were reassuring. On the mammogram, the radiologist found no significant masses suspicious for cancer, but stated "the breast [was] extremely dense, which could obscure a lesion on mammography." The radiologist testified a two to three-centimeter mass could be obscured on a mammogram in a dense breast. On ultrasound, the radiologist noted "a collection of small simple cysts" in the area of the clinically palpable mass.

Kastan was referred to Sarah Blair, M.D., a surgeon specializing in breast cancer who is employed by UCSD. After reviewing the mammogram and ultrasound results, Dr. Blair examined the area and thought Kastan had simple cysts, which was consistent with the ultrasound report. Dr. Blair told Kastan she did not have cancer. Dr. Blair offered the option of aspirating the cyst, but told Kastan she was fairly sure it was just a cyst and advised her to cut back on caffeine. Dr. Blair discussed genetic testing to determine Kastan's lifetime risk of getting cancer, but Kastan was concerned her medical insurance would become expensive or could jeopardize her children's future employability if it was determined they had a gene showing a predisposition to cancer. Dr. Blair did not order an MRI or other follow-up testing.

3

About a year and a half later, Kastan began complaining about back pain and flu-like symptoms that did not go away. Kastan's breast also changed in appearance. By January 2009, the breast was fuller and the nipple was flat and appeared tacked down. After some difficulty scheduling a mammogram, Kastan eventually underwent an MRI of the spine, a mammogram, another ultra sound and a tissue biopsy; she also obtained another referral to Dr. Blair.

Kastan was diagnosed with cancer in May 2009. She was told the cancer could not be cured at that point because she had it for some time. Kastan initially responded well to treatment. Her breast swelling resolved, she did not complain of back pain and her energy returned. However, Kastan succumbed to her cancer on December 8, 2010.

B

Uriell, and their minor children (collectively the Uriells) sued the Regents for wrongful death. The Uriells' surgical expert, Leo Gordon, M.D., opined Dr. Blair breached the standard of care by (1) failing to biopsy the area in the left breast for which she was referred and (2) failing to order an MRI to detect breast cancer and to follow-up with a biopsy of the area. Had those measures been taken at the time of the August 2007 visit, Dr. Gordon opined a biopsy "to a reasonable degree of probability . . . would have shown breast cancer." Even though the ultrasound identified only cysts, Dr. Gordon believed cancer should have been detected in 2007 based on the other presenting factors, including family history.

4

Dr. Blair and her standard of care expert, Kenneth Deck, M.D., testified neither an MRI nor a biopsy was indicated because the ultrasound showed simple cysts. Using a computer program, Dr. Blair estimated Kastan had a 17 percent lifetime risk of getting breast cancer, but told Kastan she thought this underestimated her risk. Dr. Blair admitted if a patient had a lifetime risk of getting breast cancer greater than 20 percent, the standard of care would have required obtaining an MRI. Dr. Blair testified at trial she did not believe Kastan's lifetime risk was greater than 20 percent, but was impeached with her deposition testimony in which she admitted she suspected her risk was probably in excess of 20 percent.

Dr. Deck admitted the computer program Dr. Blair used to assess the patient's risk did not account for history of disease in the paternal branch. He further admitted if her risk of cancer was greater than 20 percent, the standard of care required an MRI, which is more sensitive than a mammogram.

Dr. Blair also admitted if a doctor had access to information with the patient's family history and did not read it, "the standard of care would have been breached." The medical records showed on the date of the 2007 visit with Dr. Blair a medical assistant recorded Kastan's family history stating, "mother died of breast cancer. Diagnosed late 50's . . . paternal grandmother, breast cancer, '94. Paternal aunts, 10 females, breast cancer. Maternal aunt, breast cancer. Uncle, brain cancer." Dr. Blair conceded this was information she should have read and reviewed before treating Kastan, but did not recall seeing this piece of paper.

5

With respect to causation, the Uriells' oncology expert, Robert Brouillard, M.D., testified Kastan had the most common form of breast cancer. The fact it was estrogen receptive and HER2 negative meant it was less aggressive and amenable to treatment by both hormonal therapy and chemotherapy. Dr. Brouillard testified the tumor burden in 2007 would have been substantially less than it was when it was diagnosed in 2009. As a result, he opined it was "probable she would have had [a] more durable response to hormones alone had the tumor been diagnosed in 2007. In addition, if something had been discovered on a bone scan that also would have had a better chance of response" because there would be less chance for spontaneous mutation to resistance with a smaller tumor burden. In his opinion, "to a reasonable degree of medical probability," Kastan would have survived 10 years if she was treated early, even if she had stage 4 cancer in 2007.

The defense oncology expert, David Okun, M.D., opined Kastan had stage 4 cancer in August 2007, meaning it spread from the primary tumor to some other distant site in the body. Dr. Okun stated, "[w]e have gotten a lot better at treating patients with this. We can keep them alive five years, sometimes ten, but it's unfortunately fatal." He conceded earlier treatment would have extended her life, but would not say it would have extended her life beyond three years. He agreed a newer metastasis is more sensitive to treatment.

John Link, M.D., an oncologist who consulted with Kastan before she died, testified if she had been diagnosed in 2007, she could have taken medications to prevent the leg fractures she suffered as a result of bone metastasis and could have taken hormonal therapy to potentially put her in remission. In Dr. Link's opinion, earlier treatment would

6

have prolonged her life, but by only a few years based on the type of cancer he suspected she had. However, he admitted he did not know specifically what type of cancer she had and he did not know whether her cancer could have been more responsive to treatment if provided earlier.

Earlier in the litigation, Dr. Deck declared under penalty of perjury he believed Kastan did not have cancer in 2007. At trial, however, Dr. Deck testified she had microscopic cancer that year.

C

At the conclusion of the Uriells' case, the Regents moved for nonsuit contending the Uriells could not recover for wrongful death because they could not prove a greater than 50 percent chance Kastan would have survived her cancer because she was stage 4 when she presented in 2007. In denying the motion, the trial court distinguished this case from *Dumas v. Cooney* (1991) 235 Cal.App.3d 1583, 1605-1606, in which the court rejected the lost chance doctrine of recovery because plaintiff had only proven he was denied a 30 percent chance of recovering from his disease. In this case, the trial court ruled, "plaintiffs are not seeking to be compensated for a less-than-50 [percent] chance that Ms. Kastan would have survived. Rather, they are relying on the 'traditional approach' to recover only the extent to which it was probable 'that cancer killed the patient sooner than it would have with timely diagnosis and treatment.' " During argument on the motion, the court explained, "I think the problem is the probability. That's what those cases are talking about. We all have a terminal condition. Life is a terminal condition. Medical science, all it does is extend our life expectancy. We're all going to die, okay. So

7

in that sense it's really when you talk about causing the death we're all going to die. . . . And so what I mean by that is . . . that's what we talk about when we're talking about wrongful death, all right, is the fact that the negligence caused the death earlier than it would have otherwise occurred. That's the claim here. The difference here by comparison to the cases you're citing is that in those cases there was no probability greater than 50 percent chance that the life would have been extended. In this case we have testimony that it was. Whether the jury is going to accept that is an entirely different issue."

The jury returned a verdict for the Uriells finding, by a vote of 10 to 2, UCSD was negligent in the diagnosis or treatment of Kastan, and, by a vote of 9 to 3, UCSD's negligence was a substantial factor in causing harm to the Uriells. The court entered judgment on the jury verdict in favor of the Uriells for $548,911 plus costs.

The trial court denied the Regents' motion for new trial and declined the Regents' invitation to reweigh expert testimony to "contradict the jury's finding that [Kastan's] life would have been significantly lengthened had she been properly diagnosed and treated." In denying the motion for new trial, the trial court noted Dr. Brouillard testified "based on his experience in treating women with breast cancer, to a reasonable degree of medical probability he believed Kastan would have survived for ten more years had she obtained earlier diagnosis and treatment." As a result, the court did not believe it was inappropriate for the jury to rely on Dr. Brouillard's opinion.

8

DISCUSSION

I

*Expert Opinion Established Causation*

The Regents contend the trial court erred in denying its motions for nonsuit and new trial because Dr. Brouillard's opinion lacked adequate foundation to establish the failure to timely diagnose Kastan's cancer caused her death.  We do not agree.

Although we independently review an order on a motion for nonsuit, we apply the same test as the trial court.  Viewing the evidence in the light most favorable to the plaintiff, we will affirm an order denying a motion for nonsuit "so long as there was substantial evidence to support the jury's verdict." (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 713.)  We will not disturb a court's ruling on a motion for new trial "unless a manifest and unmistakable abuse of discretion clearly appears." (*Buckner v. Milwaukee Electric Tool Corporation* (2013) 222 Cal.App.4th 522, 530.)

"[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772.)  However, "[t]he trial court's gatekeeping role does not involve choosing between competing expert opinions.  The . . . gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.' " (*Id*. at p. 772.)  The abuse of discretion standard applies to the court's rulings regarding the admissibility of expert testimony.  (*Burton v. Sanner*

9

(2012) 207 Cal.App.4th 12, 18; *In re Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564.) " ' "Discretion is abused whenever, in its exercise the court exceeds the bounds of reason, all of the circumstances before it being considered." ' " (*Burton v. Sanner*, *supra*, at p. 18.)

The Regents' reliance on *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108 is misplaced. In that case, we determined expert testimony was properly excluded where the expert lacked a reasoned explanation for his opinion a negligent act was a cause-in-fact of injury and he based the opinion on speculation. (*Id.* at pp. 1119-1120.)

Here, contrary to Regents' contention, Dr. Brouillard's opinion was not based on speculation, and it was not derived from Kastan's family history alone. Dr. Brouillard testified based on his experience as well as Kastan's medical history. It was Dr. Brouillard's opinion Kastan had the most common type of breast cancer and the most amenable to treatment. The records indicate Kastan responded to treatment initially, and Dr. Brouillard opined she would have obtained a better result if she had been treated two years earlier when the tumor burden was less.

Dr. Brouillard agreed it was more likely than not the disease had metastasized by August 2007. However, in Dr. Brouillard's opinion, if Kastan had distant metastasis in 2007 (stage 4), she could have lived another five to 10 years or more with treatment.

When Dr. Brouillard was asked about the patient's family history as reflected in the medical records, he commented Kastan's mother's history of developing breast cancer in her early 50s and dying at age 68 or 69 of breast cancer was "a rather remarkable survival

10

with what has to be presumed stage 4 breast cancer." He explained one has to presume Kastan's mother had stage 4 cancer because, for her to have died of breast cancer, the tumor must have escaped from the breast to another part of the body after initial treatment "where it lay dormant or responsive to treatment" before it started to grow again. Since Kastan's grandmother and the grandmother's 10 sisters all died of breast cancer, as well as Kastan's mother's aunt, Kastan had a genetic abnormality passed on through the family both maternally and paternally, making her at high risk for breast cancer. The Regents did not object to this family history testimony.

Dr. Brouillard said Kastan's mother's cancer history was important because they "shared the same set of genes, which made both of them susceptible to getting breast cancer." In his opinion, "having had enough time for [Kastan's] treatment to take effect, she might have enjoyed perhaps not the same survival [as her mother] but certainly substantial survival."

When asked if Kastan could have survived 15 years like her mother, Dr. Brouillard did not respond based on Kastan's family history. Instead, he responded by saying, "*My experience* is that women who are treated early with stage 4 disease can have very long, [10] years or more survival." (Italics added.) Dr. Brouillard then concluded, *to a reasonable degree of medical probability*, Kastan would have survived 10 years if she was treated early with her stage 4 disease.[3]

---

[3] The Regents objected and moved to strike, but on the basis the causation opinion was not adequately disclosed during deposition in violation of *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 917-920 and was beyond the scope of cross-

The Regents' counsel did not follow up with questions about the basis for this opinion.  Under these circumstances, we cannot conclude the trial court abused its discretion in admitting Dr. Brouillard's expert testimony on the issue of causation or that the court erred in denying the motions for nonsuit and new trial.

## II

### *No Instructional Error*

The Regents next contend the court erred in giving CACI instructions 430 and 431 regarding causation without giving an additional special instruction stating, "Causation must be proven within a reasonable medical probability based upon competent expert testimony.  Mere possibility alone is insufficient to establish a prima facie case."  We are not persuaded and conclude the court did not err.

### A

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence."  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.)  However, "[i]nstructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a statement of law.  [Citations.]  Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition.  [Citations.]'  [Citation.]  Finally, '[e]rror cannot be

---

examination.  After an unreported sidebar, the court allowed the question and answer to be read back.  It is not evident from this record the Regents objected or moved to strike based on the foundation for the expert's opinion.

12

predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given.' " (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 359-360.)

"We independently review claims of instructional error viewing the evidence in the light most favorable to the appellant." (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.) " 'The refusal of a proper instruction is prejudicial error only if " 'it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" [Citation.] "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." ' " (*Ibid.*)

B

Here, the jury was instructed with the standard jury instruction for negligence, setting forth the essential factual elements the Uriells were required to prove: "Patrick, Alana, and John Uriell claim they were harmed by the negligence of Dr. Blair acting as an agent of the Regents . . . . To establish this claim, the Uriells must prove all of the following: [¶] 1. That UCSD was negligent; [¶] 2. That the Uriells were harmed; and [¶] 3. That UCSD's negligence *was a substantial factor* in causing their harm." (CACI No. 400, italics added.)

After instructing the jury regarding the standard of care for a physician and breast specialist, the court gave standard jury instructions regarding causation for negligence as follows:

13

"A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." (CACI No. 430.)

"A person's negligence may combine with another factor to cause harm. If you find that UCSD's negligence was a substantial factor in causing the Uriells' harm, then UCSD is responsible for the harm. UCSD cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the harm." (CACI No. 431.)

The court also instructed the jury the burden of proof required the plaintiffs to "persuade you, by the evidence presented in court, that what he or she is required to prove is more likely to be true than not true." (CACI No. 200.)

C

The court's use of standard jury instructions for the essential elements of negligence, including causation, was appropriate because medical negligence is fundamentally negligence. (CACI No. 500, use note, p. 377; *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 999 [although Medical Injury Compensation Reform Act altered certain significant aspects of medical malpractice claims from ordinary negligence claims, "the fundamental substance of such actions on the issues of duty, standard of care, breach, and causation remains unaffected"]).

14

The court's use of CACI No. 430 to instruct the jury regarding the substantial factor standard for causation was appropriate and accurately stated the applicable legal principle. "The concept of proximate or legal cause has 'defied precise definition.' [Citations] [¶] Whether a defendant's conduct actually caused an injury is a question of fact [citation] that is ordinarily for the jury [citation]. . . . Our Supreme Court has . . . observed that the 'substantial factor' test generally subsumes the 'but for' test. [Citation.] [¶] However the test is phrased, causation of fact is ultimately a matter of probability and common sense." (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 252-253.) "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 978.) Even "a very minor force" that causes harm is considered a cause in fact of the injury. (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79.) However, " 'a force which plays only an "infinitesimal" or "theoretical" part in bringing about [the] injury . . . is not a substantial factor." (*Ibid.*)

The Regents' proposed instruction on the issue of causation was based on *Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396 (*Jones*). However, *Jones* did not involve instructional error. Rather, the issue before the *Jones* court was whether the plaintiff met her evidentiary burden to allow the jury to decide the issue of causation where plaintiff's expert testimony only established a possibility (less than a 50-50 chance) an oral contraceptive was causally connected to the development or aggravation of plaintiff's cancer. (*Id.* at pp. 401-402.) The appellate court noted, "[t]he law is well settled that in a personal injury action causation must be proven within a reasonable

15

medical probability based upon competent expert testimony.  Mere possibility alone is insufficient to establish a prima facie case.  [Citations.]  That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion.  There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease.  A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action.  This is the outer limit of inference *upon which an issue may be submitted to the jury*."  (*Id.* at pp. 402-403, italics added.)

Jones went on to explain, "[a]lthough juries are normally permitted to decide issues of causation without guidance from experts, 'the unknown and mysterious etiology of cancer' is beyond the experience of laymen and can only be explained through expert testimony.  [Citation.]  Such testimony, however can enable a plaintiff's action *to go to the jury* only if it establishes a reasonably probable causal connection between an act and a present injury.  [¶]  . . .  '[In] the absence of factual circumstances of probability understandable to a jury there must be some scientific testimony that can be interpreted as an inference of hypothetical probability before we can allow a jury to speculate upon the rights of citizens.  . . .  If experts cannot predict probability in these situations, it is difficult to see how courts can expect a jury of laymen to be able to do so."  (*Jones*, *supra*, 163 Cal.App.3d at p. 403, italics added.)  Based on the record before it, the *Jones* court concluded the expert testimony was insufficient to meet plaintiffs' prima facie burden to establish causation, and, thus, the trial court properly granted nonsuit.  (*Id.* at p. 404.)

16

Similarly, in *Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1498-1499 (*Bromme*), the appellate court held nonsuit was appropriate where plaintiff did not establish negligence caused the decedent's death because expert witnesses agreed the chance of surviving cancer was less than 50 percent even with proper medical intervention. "Consequently, defendant's alleged negligence . . . was not a substantial factor (cause in fact) of . . . death." (*Ibid.*)

These cases are consistent with other negligence cases. In *Raven H. v. Gamette* (2007) 157 Cal.App.4th 1017, 1029, the court held " ' "[A plaintiff] is not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that he introduces evidence from which reasonable [persons] may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no [person] can say with absolute certainty what would have occurred if the defendant had acted otherwise." ' " If the evidence presented on causation leaves the matter " 'one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." ' " (*Id.* at p. 1030.) "In *any* negligence case, the plaintiff must present evidence from which a reasonable fact finder may conclude that defendant's conduct probably was a substantial factor in bringing about the harm." (*Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1416, fn. 2.)

Therefore, *Jones*, *supra*, 163 Cal.App.3d 396 and *Bromme*, *supra*, 5 Cal.App.4th 1487, do not require a heightened standard for causation in medical malpractice cases as the Regents suggest. Rather, these cases address the factual burden a plaintiff is required

17

to meet to establish a prima facia case.  If a plaintiff cannot present evidence the defendant's conduct more likely than not was a substantial factor (a cause in fact) of plaintiff's alleged injury, then the issue of causation should not go to the jury and the defendant is entitled to judgment.  As explained in *Lineaweaver v. Plant Insulation Co., supra*, 31 Cal.App.4th at p. 1416, footnote 2, the reference to "medical probability" in medical malpractice cases is no more than a recognition the case involves the use of medical evidence.

In this case, as we have discussed, Dr. Brouillard testified to a reasonable degree of medical probability Kastan would have survived 10 additional years if her cancer had been timely diagnosed and treated in 2007.  As the trial court correctly determined, this testimony is distinguishable from *Dumas v. Cooney*, *supra*, 235 Cal.App.3d at pp. 1597-1598, 1605-1606, which it was alleged the patient was denied only a possibility (a 30 percent chance) of survival by the delayed diagnosis.  Here, Dr. Brouillard's testimony established to a probability (greater than 50 percent) of a better result, Kastan's survival for more than 10 years, if she were timely diagnosed in 2007.  (*Id*. at p. 1603.)  This was sufficient to meet the plaintiffs' prima facie burden on causation and the jury was required to consider and weigh the evidence, including the credibility of the expert witnesses.  The jury decided it was more likely true than not true that the Regents' failure to diagnose Kastan's breast cancer in 2007 was a substantial factor in causing Kastan's untimely death. (CACI Nos. 200, 430.)  We find no error.

18

D

We are also not persuaded CACI No. 431 confused the jury or diluted the standard for causation. The Regents conflate the legal concepts of substantial factor for causation and concurrent cause. CACI No. 431 is necessary to explain to the jury a "plaintiff need not prove that the defendant's negligence was the sole cause of plaintiff's injury in order to recover. Rather it is sufficient that defendant's negligence is *a* legal cause of injury, even though it operated in combination with other causes, whether tortious or nontortious." (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1158.) Failure to give an instruction on concurrent and multiple causes, where appropriate, is reversible error. (*Id*. at p. 1166.)

In *Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304 (*Espinosa*), the appellate court reversed a nonsuit in a medical malpractice case because the plaintiff produced expert evidence indicating there were three separate causes of a baby's brain injury (two attributable to the defendants and one attributable to the mother's use of medication early in the pregnancy), all of which the expert testified were substantial and contributory to the injury. (*Id*. at pp. 1316-1317, 1321.) The Court of Appeal distinguished *Jones*, *supra*, 163 Cal.App.3d 396 in which the plaintiff's experts were unable to make a causal connection showing the use of the drug and the development of cancer was more than a 50-50 possibility. In *Espinosa*, however, the expert testified to direct causal effect. (*Espinosa*, *supra*, at p. 1320.) The *Espinosa* court concluded the plaintiff is not required to apportion damages among multiple causes. "It is only necessary that a plaintiff demonstrate that the negligence of the defendant was *a* substantial factor in causing the claimed injury." (*Id.* at p. 1321.)

19

Similarly here, the Uriells established through Dr. Brouillard's testimony the Regents' negligence was *a* substantial factor in causing Kastan to die 10 years earlier than she would have if she had been timely diagnosed and treated.  The fact she had cancer, which acted concurrently, as another substantial factor in causing her death, did not relieve the Regents of liability.  CACI No. 431 properly explained this issue of concurrent substantial causes to the jury.

## DISPOSITION

The judgment is affirmed.  Plaintiffs shall recover their costs on appeal.


McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


McDONALD, J.

20

Filed 2/20/15

CERTIFIED FOR PARTIAL PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PATRICK URIELL, Individually and as Trustee, etc. et al.,<br><br>    Plaintiffs and Respondents,<br><br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>    Defendant and Appellant. | D064098<br><br><br>(Super. Ct. No. 37-2011-0091600-CU-PO-CTL)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:

The opinion filed on January 29, 2015, is ordered for partial publication with the exception of part I.

The attorneys of record are:

Carroll, Kelly, Trotter, Franzen, McKenna & Peabody; John C. Kelly, David P. Pruett and Natalie J. Buccini for Defendant and Appellant.

Niddrie Fish Addams and David A. Niddrie; Cynthia Chihak & Associates and Cynthia Chihak for Plaintiffs and Respondents.

McCONNELL, P. J.

Copies to:  All parties

21