Filed 8/19/20  Hernandez v. Qureshi CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| EDY HERNANDEZ, individually and as Guardian Ad Litem for Elias Hernandez et al., | B290866 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC620654) |
| v. | |
| AZMATH QURESHI, M.D. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Marc D. Gross, Judge.  Affirmed in part and reversed in part.

Law Offices of Ashton Watkins and Ashton R. Watkins for Plaintiffs and Appellants.

Carroll, Kelly, Trotter, Franzen & McBride, Mark V. Franzen, Jennifer L. Sturges and David P. Pruett for Defendants and Respondents.

_____

Marleny Escobar was 34 years old when she died of hemophagocytic lymphohistiocytosis (HLH), a rare immunodeficiency disease. She was diagnosed and died shortly after she gave birth to her second son. Two years after her death, her husband and sons sued Dr. Azmath Qureshi, the doctor who provided Escobar with prenatal care, and alleged that Dr. Qureshi's failure to investigate Escobar's symptoms of HLH during her pregnancy fell below the standard of care and caused her premature death.

The court granted judgment on the pleadings as to husband on the ground his claim was time-barred. Dr. Qureshi then moved for summary judgment against the remaining plaintiffs on the element of causation. Dr. Qureshi argued that Escobar's symptoms did not meet the criteria for an HLH diagnosis while she was pregnant and, therefore, Dr. Qureshi could not have provided Escobar with any treatment. In opposition, plaintiffs submitted a declaration by an obstetrician/gynecologist opining that if Dr. Qureshi had taken steps to investigate and treat Escobar's symptoms while pregnant, it was more likely than not Escobar would have survived.

The trial court struck the declaration of plaintiffs' expert on the ground he did not have any experience treating patients with HLH. The court further concluded that, even if the expert's declaration were admissible, it failed to raise a triable issue of material fact as to causation because the expert did not opine that Escobar's "chance of survival would have been greater than 50% if Defendants had acted differently."

Plaintiffs appealed. They challenge the trial court's order granting judgment on the pleadings as to husband's claim. They further argue the trial court erred in striking their expert's

declaration and concluding plaintiffs failed to raise a triable issue of material fact as to causation. We agree the trial court properly granted judgment on the pleadings. We find error with the trial court's striking of plaintiffs' expert's declaration and the court's conclusion the declaration failed to raise a triable issue of fact. We reverse the summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Consistent with our standard of review of orders granting summary judgment, we will recite the facts in the light most favorable to plaintiffs as the nonmoving parties. (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 81.)

### 1.      The Illness and Death of Marleny Escobar

On October 29, 2013, Escobar attended her first prenatal appointment with defendants. She was ten weeks pregnant, and weighed 176 pounds. She complained of pain with urination and blood in her urine, and was prescribed a medicine for urinary tract infections. Lab results showed a low white blood cell count, and low platelet counts which were flagged on the report as abnormal.

Starting in December 2013 or January 2014, Escobar began to have daily fevers. On January 16, 2014, Escobar presented with a temperature of 102, a sore throat, congestion, cough and an earache. Dr. Qureshi prescribed her an antibiotic. Although Escobar was five months pregnant, she had not gained any weight since her initial appointment with defendants.

The following month, on March 4, 2014, Escobar had a temperature of 100.4 and complained of a cough. She reported drinking 10 to 12 glasses of water a day and experiencing a strong urge to urinate, while only urinating small amounts. She had lost 10 pounds, and said that being sick had caused her not

3

to eat.  A urinalysis showed abnormal levels of proteins, ketones and bilirubin.  Lab results showed that her white blood cell count remained abnormally low.  Dr. Qureshi prescribed her an antibiotic, and did not order any additional work-up of the white blood cell count.

On March 18, 2014, Escobar was admitted to the hospital for the early onset of labor.  She arrived at the hospital with a temperature of 101.8.  Ultrasound examinations showed an enlarged fatty liver and gallstones.  Routine lab work showed her white blood cell count was still abnormally low, and she had "severely deranged liver function."  Her urine was dark with abnormal levels of electrolytes.

Escobar gave birth the following day, March 19, 2014, to a healthy boy.  She was then transferred to Long Beach Memorial Medical Center into Dr. Jennifer McNulty's care.  Dr. McNulty consulted several specialists about Escobar's case.  Within a week, the doctors were considering HLH as a diagnosis.  Three days later, she was started on treatment for HLH.

Escobar died the following month on April 17, 2014.  Autopsy findings confirmed her diagnosis of HLH and a fungal infection throughout her body.

## 2.    *The Complaint*

In May 2016, Escobar's husband and sons filed a complaint for wrongful death alleging medical malpractice by Dr. Qureshi, her medical practice, and Elizabeth Bolanji, a nurse (collectively, defendants).  The complaint alleged that Escobar exhibited symptoms of HLH when she received prenatal care with defendants, and defendants' failure to provide her with proper treatment fell below the standard of care, causing her death.

4

### 3. *Motion for Judgment on the Pleadings*

Defendants moved for judgment on the pleadings as to husband's individual claim for wrongful death. They argued husband's claim was time-barred because he discovered Escobar's injury when she died in April 2014, and under the one-year statute of limitations, he only had until April 2015 to file his claims. The complaint was filed a year later.

In opposition, husband argued that the statute of limitations did not begin to run until he began to suspect medical malpractice when his pastor suggested he speak to an attorney in July 2015. He then timely filed the complaint within a year. Defendants replied by referencing husband's statements during discovery in which he admitted he suspected as early as March 2014 that defendants had failed to correctly diagnose Escobar.

The trial court granted the motion, relying on the principle that plaintiffs were required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of information that would have been revealed from such an investigation. (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 808 (*Fox*).) The court observed that husband did not "point to anything he learned in July 2015 that caused him to ask his pastor if the doctor may have done something wrong."

### 4. *Defendants Move for Summary Judgment*

In September 2017, defendants moved for summary judgment on the ground that plaintiffs could not prove causation.[1] Defendants' motion was supported by the expert

---

[1] Dr. Qureshi and her medical practice moved for summary judgment, and the court granted Bolaji's joinder.

testimony of Dr. Kenneth McLain, a pediatrician with a specialty in hematology and oncology. As part of his practice, Dr. McLain treated children with HLH.

Dr. McLain opined that "no act or omission on the part of Dr. Qureshi caused or contributed to the death of Ms. Escobar." To "meet the criteria for [an] HLH diagnosis," a patient's "ferritin level must be above 3,000," and before Escobar was hospitalized, her ferritin level never rose above 3,000. Thus, "even if additional blood work had been performed during Ms. Escobar's pregnancy, she would not have met the criteria for a diagnosis of HLH." "By the time HLH was diagnosable in Ms. Escobar . . . she would not have survived the disease process."

### 5. *Plaintiffs' Opposition*

Plaintiffs' opposition to the motion for summary judgment was supported by the expert declaration of Dr. Paul Sinkhorn, an obstetrician/gynecologist. Dr. Sinkhorn's opinions were based on his medical experience and review of Dr. McLain's medical articles on HLH.

In response to Dr. McClain's opinion that Escobar could not have been diagnosed with HLH prior to her hospitalization, Dr. Sinkhorn opined that she could have still received treatment for HLH even without a diagnosis. Dr. Sinkhorn cited to research stating that "treatment is appropriate for some who do not meet the strict diagnostic criteria but for whom there is a high degree of clinical suspicion for HLH," and "therapy may be necessary before a firm diagnosis is in hand."

Dr. Sinkhorn opined that had Escobar received earlier treatment for HLH, "more probably than not" she would have been able to arrest or slow down "her disease process." He cited to research stating that "[p]rompt initiation of treatment for HLH

6

is essential to the survival of affected patients," and "[s]urvival can be dramatically increased with HLH-specific therapy."

Dr. Sinkhorn also opined that even before any suspicion of an HLH diagnosis was possible, had Escobar's doctors treated her elevated liver enzymes and her neutropenia, such interventions could have enabled Escobar "to fight her disease process before her immune system was fully defeated."

Dr. Sinkhorn concluded that Dr. Qureshi and her staff's failure to address Escobar's symptoms of "systemic illness" throughout her pregnancy "led to an unchecked progression of her disease until 3/18/14, when she went into preterm labor and was noted to have an extremely dangerous neutropenia that was now resistant to treatment, and that ultimately led to disseminated infection, multiple organ failure, and death." "Dr. Qureshi's negligent act or omission . . . was a substantial factor in causing Decedent's death."

### 6. *Dr. Qureshi's Reply and Evidentiary Objection*

In reply, defendants claimed Dr. Sinkhorn's declaration was defective because it did not state Escobar would have had a better than 50 percent chance of surviving HLH had Dr. Qureshi acted differently. Dr. Qureshi argued that "Plaintiffs are not entitled to recovery based upon a mere possibility that Decedent's chance of survival would have improved if HLH had been diagnosed earlier. Dr. Sinkhorn's declaration does not satisfy Plaintiffs' burden of production because, at best, his opinion is that Decedent would have had an increased chance of survival but falls well short of the requirement that Decedent have a better than 50 percent chance of survival."

Dr. Qureshi also objected to Dr. Sinkhorn's declaration on the ground it lacked foundation because Dr. Sinkhorn had no

expertise in "the diagnosis or treatment of HLH." The trial court sustained the objection, concluding that "[a]bsent a showing of expertise concerning HLH, e.g., what causes HLH, how HLH is treated, the progression of HLH, and the prognosis of a patient with HLH, Dr. Sinkhorn failed to establish he is qualified to refute Dr. McLain's opinions." The court struck Dr. Sinkhorn's declaration in its entirety.

### 7. *The Granting of Summary Judgment*

The court granted summary judgment concluding that "plaintiffs necessarily failed to meet their burden of raising a triable issue of material fact in light of the lack of admissibility of the Declaration of Sinkhorn." In the alternative, the court concluded that Dr. Sinkhorn's declaration, even if admissible, did not raise a triable issue of fact as to causation because Dr. Sinkhorn did not "establish Decedent had a greater than 50% chance of survival if Defendants had done something differently." Dr. Sinkhorn's opinion that "an earlier diagnosis would have given Decedent an 'improved chance for survival and wellness,' " was insufficient to show that her "chance of survival would have been greater than 50% if Defendants had acted differently." He "never actually opines that any different action on the part of Defendants would have given [the decedent] a greater than 50% chance of survival."

Plaintiffs timely appealed.

8

## DISCUSSION

### 1. The Trial Court Properly Granted the Motion for Judgment on the Pleading because the Complaint's Allegations Demonstrate Husband's Action is Barred by the One-Year Statute of Limitations

Plaintiffs argue the trial court erred in granting judgment on the pleadings on statute of limitations grounds. They contend the statute of limitations did not begin running at the time of Escobar's death because husband had no suspicion of wrongdoing prior to talking with his pastor in July 2015. Lastly, plaintiffs claim they can amend their complaint to show husband did not have reason to suspect defendants of wrongdoing until July 2015. We find no error.

"In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first." (Code Civ. Proc., § 340.5.) "The term 'injury' means both the plaintiff's physical condition and its negligent cause; thus, once a plaintiff knows, or by reasonable diligence should have known, he or she has been harmed through professional negligence, the one-year limitations period begins to run. [Citation.]" (*Jefferson v. County of Kern* (2002) 98 Cal.App.4th 606, 610.)

For purposes of Code of Civil Procedure section 340.5, a plaintiff "is 'charged with "presumptive" knowledge of his negligent injury, and the statute commences to run, once he has " 'notice or information of circumstances to put a reasonable person *on inquiry,* or *has the opportunity to obtain knowledge*

9

from sources open to his investigation . . . .' " [Citation.] Thus, when the plaintiff's "reasonably founded suspicions [have been aroused]," and he has actually "become alerted to the necessity for investigation and pursuit of [his] remedies," the one-year period for suit begins. [Citation.]' " (*Artal v. Allen* (2003) 111 Cal.App.4th 273, 279.) A plaintiff "need not know the 'specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place—he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does [citation]." (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 398.)

We review the pleadings de novo to determine whether the trial court erred in granting the motion. (*O'Neil v. General Security Corp.* (1992) 4 Cal.App.4th 587, 594, fn. 1.) As to the right to amend following a grant of a motion for judgment on the pleadings, the abuse of discretion standard applies. (*Virginia G. v. ABC Unified School Dist.* (1993) 15 Cal.App.4th 1848, 1852.) A trial court abuses its discretion in granting a motion for judgment on the pleadings without leave to amend where the complaint "does not show on its face that it is incapable of amendment." (*Ibid.*)

Here, the trial court found that the one-year limitations of Code of Civil Procedure section 340.5 commenced with Escobar's death. The court reasoned that a plaintiff must conduct an investigation after becoming aware of an injury, and is charged with knowledge of information that would have been revealed by such an investigation. (*Fox, supra,* 35 Cal.4th at p. 808.)

10

Husband did not allege any facts showing he had conducted a reasonable investigation after learning of his wife's death, or "point to anything he learned in July of 2015 that caused him to ask his pastor if the doctor may have done something wrong."

The complaint alleged facts showing husband was on inquiry notice of his cause of action against defendants at the time of Escobar's death. Six months before her death, she experienced "warning signs of symptoms of illness . . . . [She] had multiple illness[es] during her pregnancy . . . [and] developed daily fevers of 101–102. Despite these warning signs, Defendants . . . failed to conduct further testing or follow up lab work or refer Decedent to another physician for evaluation, diagnosis or treatment." Based on these allegations that wife suffered obvious symptoms during pregnancy that defendants did not treat, husband "either had or reasonably should have 'become alerted to the necessity of investigation and pursuit of [his] remedies.' [Citation.]" (*Graham v. Hansen* (1982) 128 Cal.App.3d 965, 975.)

Plaintiffs contend they can allege facts showing husband did not have "reason to know that Defendants caused Ms. Escobar's death until July 2015." However, plaintiffs do not state what those facts are and have, therefore, failed to show how they would amend to show husband's inability to have made earlier discovery despite reasonable diligence. They do not, for example, address husband's statements during discovery that he suspected as early as March 2014 that defendants had failed to correctly diagnose Escobar.

As the complaint showed on its face that it was barred by the statute of limitations and plaintiffs have not shown how they

11

could amend to cure this defect, we conclude the trial court properly granted the motion without leave to amend.[2]

## 2. *Expert Declarations*

### a. **Law on Expert Testimony**

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) " '[T]he determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for truth.' [Citation.]" (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115.) "It is the jury's role to decide the weight to accord to the expert testimony and 'courts must . . . be cautious in excluding expert testimony' so as not to usurp that role. [Citation.]" (*People v. Veamatahau* (2020) 9 Cal.5th 16, 35, fn. 6.)

The trial court acts as a gatekeeper to exclude improper expert opinion. "The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion. [Citation.] In short, the gatekeeper's role 'is to make certain that an expert,

---

[2] Defendants also contend that plaintiffs' appeal from the order granting judgment on the pleading is untimely because they should have appealed within 60 days of the order granting the motion. However, an order on a motion for judgment on the pleading is not appealable; any appeal must be taken from the judgment itself. (*Ellerbee v. County of Los Angeles* (2010) 187 Cal.App.4th 1206, 1212–1213.) There was no separate judgment entered against husband. The appeal was timely when measured by the date of the judgment entered following the grant of summary judgment.

*whether basing testimony upon professional studies* or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 772 (*Sargon*) (emphasis added).)

" '[W]ork in a particular field is not an absolute prerequisite to qualification as an expert in that field.' [Citation.] For example, '[q]ualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion.' [Citations.] The determinative factor is whether the expert 'has sufficient skill or experience in the field so that his [or her] testimony would be likely to assist the jury in the search for the truth.' [Citation.] The degree of expertise goes to the weight of the expert's testimony, not its admissibility. [Citation.]" (*Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1318–1319 (*Chavez*); see also *Brown v. Colm* (1974) 11 Cal.3d 639, 645 [referring to the "unmistakable general trend in recent years . . . toward liberalizing the rules relating to the testimonial qualifications of medical experts"].)

"It is true . . . that the question whether a witness qualifies as an expert is a matter addressed in the first instance to the sound discretion of the trial court. [Citation.] It is also elementary, however, that the court will be deemed to have abused its discretion if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go before the jury." (*Chavez, supra*, 207 Cal.App.4th at p. 1319; *People v. Lucas* (2014) 60 Cal.4th 153, 226.) " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles

13

governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' [Citation.]" (*Sargon*, *supra*, 55 Cal.4th at p. 773.)

      **b.**    **The Trial Court Erred in Striking Dr. Sinkhorn's Declaration**

Plaintiffs contend the trial court erred in striking Dr. Sinkhorn's declaration because he was qualified to testify about whether defendants' acts or omissions were a substantial factor in causing Escobar's death. Defendants argue the trial court properly found that Dr. Sinkhorn lacked an adequate foundation to testify about causation because he had never "seen, diagnosed, or treated a case of HLH." We conclude the trial court abused its discretion in striking Dr. Sinkhorn's declaration.

Defendants cite to *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493 in support of their argument that Dr. Sinkhorn lacked the qualifications to opine on causation. *Bushling* is inapposite; that case did not address the issue of whether an expert was qualified to testify. Instead, *Bushling* examined the substance of certain medical experts' opinions on causation, concluding that their opinions were speculative and not supported by any factual basis. (*Id.* at p. 511.)

Dr. Sinkhorn had experience in the subject matter at hand—the field of obstetrics medicine. He had practiced as an obstetrician-gynecologist for over thirty years and was a professor at several local medical schools. In preparation for his testimony, he reviewed Escobar's medical records, Dr. McLain's declaration, and medical publications by Dr. McClain on the diagnosis and treatment of HLH. Based on Dr. Sinkhorn's personal experience as a medical practitioner, his knowledge of Escobar's medical condition, and his review of professional studies about her

14

specific disease, he was qualified to opine on whether defendants' actions or omissions caused Escobar's death from HLH. This is not a case where we can say the expert's opinion was "clearly invalid and unreliable" and would be unlikely to assist the jury in its fact-finding mission. (*Sargon*, *supra*, 55 Cal.4th at p. 772.) Admittedly, there were gaps in Dr. Sinkhorn's expertise. He had not treated an HLH patient. However, he was an expert in obstetrics and was qualified to testify about the symptoms presented by Escobar, and the effect a lack of treatment of those symptoms had on her health. What he lacked in HLH experience he filled in by relying on Dr. McCain's own studies.[3] The different qualifications of the two medical experts – Dr. McCain was not an obstetrician and did not treat pregnant women – goes to the weight that the trier of fact might assign to their opinions.

The trial court erred in concluding Dr. Sinkhorn was unqualified as an expert witness, and striking his declaration.

### c. The Court Properly Overruled the Objection to Dr. McLain's Qualifications

Plaintiffs contend the trial court erred in overruling their objection to Dr. McClain's declaration. They argue he was not qualified to opine on the standard of care because he had no expertise in obstetrics or gynecology. However, Dr. McClain only opined on causation, not the standard of care. Plaintiffs do not dispute that Dr. McClain had expertise in the diagnosis and treatment of HLH patients. He, therefore, was qualified to opine on whether any actions or omissions by defendants caused

---

[3] It is established law that an expert may base his or her testimony upon a review of professional studies. (*Sargon*, *supra*, 55 Cal.4th at p. 772; *Miller v. Silver* (1986) 181 Cal.App.3d 652, 659.)

Escobar's treatment for HLH to be delayed and her to die prematurely. The trial court did not abuse its discretion in overruling plaintiffs' objection to Dr. McClain's declaration based on lack of foundation.

### 3.    *Summary Judgment*

Defendants moved for summary judgment on lack of causation.[4]  On appeal from a grant of summary judgment in a medical malpractice wrongful death action, lack of causation presents the question of whether a decedent would have had a greater than 50 percent chance of survival but for the malpractice. (*Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1492–1493 (*Bromme*).)  In the context of the present appeal, it is: Would Escobar have had a greater than 50 percent chance of survival if defendants taken steps to address her symptoms of HLH prior to her hospitalization in March 2014.  We analyze plaintiffs' claim of error in two steps:  first, we consider whether defendants carried their initial burden to show the absence of a triable issue of material fact, and second, if defendants carried their burden, we decide whether plaintiffs' showing was sufficient

---

[4]    Appellants' Opening Brief also addressed whether defendants' conduct breached the standard of care.  In their Respondents' Brief, defendants pointed out that their motion was limited to causation and argued that plaintiffs had impermissibly commingled the two points.  In their Reply Brief, plaintiffs occasionally refer to standard of care but present no argument on the point.  This is understandable.  Because defendant's motion for summary judgment did not address whether defendants had breached the standard of care, plaintiffs were under no obligation to rebut it.  (See *Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1594.)  Our opinion focuses on the sole ground of defendants' motion for summary judgment—that no triable issue of fact exists as to causation.

to carry their burden of a prima facie showing of the existence of a triable issue of fact.

### a. Standard of Review

The trial court must grant a summary judgment motion if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 473c, subd. (c).) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) A moving party bears the initial burden of producing evidence to make a prima facie showing that no triable issue of material fact exists. (*Ibid.*) A defendant moving for summary judgment must produce evidence showing that the plaintiff cannot establish at least one element of each of its causes of action. (*Id.* at p. 854.) The burden of production then shifts to the party opposing summary judgment who must produce evidence to make a prima facie showing that a triable issue of material fact exists. (*Id.* at p. 850.)

"Because of the severity of the consequences of summary judgment, we carefully scrutinize the moving party's papers and resolve all doubts regarding the existence of material, triable issues of fact in favor of the party opposing the motion. [Citation.]" (*Connelly v. County of Fresno* (2006) 146 Cal.App.4th 29, 36.) " ' "[T]he moving party's affidavits are strictly construed while those of the opposing party are liberally construed." . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's

17

evidence . . . .' [Citation.]" (*Cheyanna M. v. A.C. Nielsen Co.* (1998) 66 Cal.App.4th 855, 861.)

### b. Causation in Wrongful Death Actions

Code of Civil Procedure section 377.60 provides: "A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by . . . [¶] [t]he decedent's . . . children . . . ." " 'The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs. [Citations.]' [Citation.]" (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1263.) Additionally, "the plaintiff [in a wrongful death action] must prove the defendant's conduct was a substantial factor in causing the decedent's death." (*Bromme, supra*, 5 Cal.App.4th at p. 1507.)

In the medical malpractice context, "the element of causation is satisfied when a plaintiff produces sufficient evidence 'to allow the jury to infer that in the absence of the defendant's negligence, there was a *reasonable medical probability* that the [patient] would have obtained a better result. [Citations.]' [Citation.]" (*Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1314–1315 (*Espinosa*).) "Causation is generally a question of fact for the jury, unless reasonable minds could not dispute the absence of causation." (*Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 666.)

"Where the alleged negligence relates to the failure to diagnose and treat a potentially terminal condition, a plaintiff fails to satisfy the requisite causation if the evidence shows the decedent did not have a greater than 50 percent chance of survival had the defendant properly diagnosed and treated the

condition." (*Bromme, supra*, 5 Cal.App.4th at pp. 1492–1493.) " 'While there is no judicially approved definition of what is a substantial factor for causation purposes, it seems to be something which is more than a slight, trivial, negligible, or theoretical factor in producing a particular result.' [Citation.]" (*Espinosa, supra*, 31 Cal.App.4th at p. 1314.)

"The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. [Citations.] That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury. [Citation.]" (*Jones v. Ortho Pharm. Corp.* (1985) 163 Cal.App.3d 396, 402–403.)

### c. Defendants' Initial Burden in Moving for Summary Judgment

Plaintiffs contend the trial court erred in concluding defendants met their initial burden as moving parties for summary judgment. Plaintiffs argue Dr. McClain "failed to set forth any reasoned analysis of his opinion that Defendants did not cause Ms. Escobar's death." We disagree.

Dr. McClain opined that a diagnosis of HLH requires a ferritin level of above 3,000. According to Dr. McClain, Escobar could not have been diagnosed with or treated for HLH prior to

19

her hospitalization because "she did not meet the criteria for an HLH diagnosis" as her ferritin level was under 3,000 when she was in defendants' care. This analysis supported Dr. McClain's conclusion that no act or omission by Dr. Qureshi caused or contributed to Escobar's death. This was a reasoned analysis, supported by the facts of the case, and not the "naked" conclusion plaintiffs assert.

This evidence was sufficient to meet defendants' initial burden of proof to show a prima facie case that plaintiffs could not establish causation.

### d. Plaintiffs' Burden in Opposing Summary Judgment

Plaintiffs contend the trial court erred in concluding they did not raise a triable issue of material fact as to causation. They argue Dr. Sinkhorn's declaration adequately stated Dr. Qureshi's negligence was a substantial factor in causing Escobar's death. Defendants contend Dr. Sinkhorn failed to state whether earlier treatment for HLH "would have had a medical probability of averting Ms. Escobar's death." Reading the declarations liberally, as we must, we conclude that Dr. Sinkhorn's declaration created a triable issue of material fact that defendants' negligence caused Escobar's death.

The trial court concluded that Dr. Sinkhorn "never actually opines that any different action on the part of Defendants would have given [Escobar] a greater than 50% chance of survival." But Dr. Sinkhorn did state that had Dr. Qureshi conducted an investigation and work-up of Escobar's symptoms "in November or December 2013, it is more likely than not that an early diagnosis could have been made and appropriate therapy instituted by January 2014." Had Escobar received such an

20

"earlier diagnosis and earlier treatment," "more probably than not" Escobar would have had a "better chance at arresting or ameliorating her disease process." Dr. Sinkhorn cited to research finding that patients who receive the recommended regimen of treatment for HLH have "a median survival of 54 percent at 6.2 years."

In response to Dr. McLain's conclusion that Escobar could not have been treated for HLH prior to her hospitalization because her ferritin levels were below 3,000, Dr. Sinkhorn cited to research stating that treatment is appropriate for some patients who "do not meet the strict diagnostic criteria." Dr. Sinkhorn also attested that defendants should have treated some of Escobar's symptoms, and such measures would have strengthened Escobar's immune system. This would have enabled her body to fight the HLH. Instead, by doing nothing, Escobar's illness progressed to the point where her neutropenia was "resistant to treatment" when she was finally admitted to the hospital. The impairment of Escobar's immune system "predispose[d]" her to the fungal infection that was one of the causes of her death. Had Escobar either been treated earlier for HLH or had her observable symptoms during her pregnancy been reasonably addressed, she would have more likely than not survived.

These opinions did not posit "some theoretical possibility the negligent act *could have been* a cause-in-fact of a particular injury." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.) Rather, Dr. Sinkhorn's declaration, "entitled to all favorable inferences that may reasonably be derived from that declaration," was sufficient to raise a triable issue of fact as to whether Escobar's chance of

21

surviving was more than 50 percent had Dr. Qureshi properly taken steps to investigate her symptoms.  (*Hanson v. Grode* (1999) 76 Cal.App.4th 601, 607–608.)

Defendants contend that Dr. Sinkhorn did not raise a triable issue of material fact because he made only "conclusory assertions," and failed to provide any "factual description to suggest how or when defendants would have acted to have prevented the death of Ms. Escobar."  On the contrary, Dr. Sinkhorn set forth four specific actions defendants should have taken that would have prevented Escobar's death.

First, when defendants learned Escobar had a "significantly depressed" white blood cell count in October 2013, "along with a low platelet count and a borderline absolute neutrophil count," they should have referred her "to a specialist (internist, perinatologist, or hematologist) capable of performing a full diagnostic work-up" or, "at the very least . . . ordered a repeat CBC with manual differential to confirm or negate the abnormal findings."  Had they done so, "the pertinent contributing abnormalities could have been addressed much earlier by targeted therapies, and these treatments would have had a significantly higher chance of amelioration or arrest of progression, with an attendant lowering of her chance of fatality."

Second, when Escobar registered a fever of 102 on January 16, 2014 and upper respiratory symptoms, Escobar "should have been sent for a CBC and chest X-ray. . . .  If a CBC would have been done at this time, it is more likely than not that leukopenia would again have been noted."

Third, defendants should have observed and recorded Escobar's daily fevers from January through March 2014, and ordered a work-up.  Had they done so, her continued neutropenia

22

would have been discovered.  These were missed opportunities for Escobar to have her symptoms treated.

Fourth, two weeks before Escobar's hospitalization, when she presented with a cough, fever, an abnormally low white blood cell count, and abnormal levels of protein, ketones and bilirubin in her urine, defendants should have referred her to a specialist. Had they done so, "it is more probable than not that Mrs. Escobar would have had a better chance of disease amelioration . . . ."

These were not expert opinions "based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors" lacking foundation.  (*Jennings*, *supra*, 114 Cal.App.4th at p. 1117.)  Instead, Dr. Sinkhorn's opinion was supported by clear, reasoned explanations.  Thus plaintiffs met their prima facie burden of showing triable issues of fact as to causation, and the motion for summary judgment should have been denied.

## *DISPOSITION*

The summary judgment is reversed.  The court's order granting judgment on the pleadings is affirmed.  Appellants to recover their costs on appeal.


RUBIN, P. J.

WE CONCUR:


BAKER, J.


KIM, J.


23