Filed 3/14/23  Hernandez v. County of L.A. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| EVANGELINA HERNANDEZ, | B318699 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV24771) |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Peter A. Hernandez, Judge.  Reversed.

Rees Law Firm and Robert A. Rees; The Claypool Law Firm, Brian E. Claypool and Nathalie Vallejos; Taylor & Ring, David M. Ring and Sonya Ostovar for Plaintiff and Appellant.

Beach Law Group, Thomas E. Beach and Darryl C. Hottinger for Defendant and Respondent Hathaway-Sycamores Child and Family Services.

Noah C. was removed from and returned to his abusive parents' custody multiple times before dying under suspicious circumstances in their care in July 2019, at the age of four. Noah's great-grandmother Evangelina "Eva" Hernandez, as successor in interest to Noah's estate and guardian ad litem for his minor siblings A.C., E.C., and R.C., filed a third amended complaint (TAC) asserting survival and wrongful death causes of action against Hathaway-Sycamores Child and Family Services (Hathaway), a mental health services provider that worked with the family in 2018.[1] The TAC alleged that Hathaway failed to provide Noah and his parents with appropriate therapy, for which it negligently and erroneously concluded Noah had no medical need. It further alleged that Hathaway's negligent assessment was reported to the dependency court and was a substantial factor in the dependency court's decision to return Noah to his parents' care in early November 2018 and his tragic death eight months later.

The trial court sustained Hathaway's demurrer to both causes of action. It ruled that the TAC failed to allege facts supporting the conclusion that any negligence by Hathaway was the legal or proximate cause of Noah's death. The trial court concluded the allegations concerning Hathaway were too attenuated from Noah's death, which occurred after several other incidents not involving Hathaway. The trial court denied leave to

---

[1] The TAC also asserted causes of action against the County of Los Angeles (the County) due to the alleged negligence of the Department of Children and Family Services (DCFS), which retained Hathaway and had other involvement with the family. Those causes of action are not at issue here, and the County is not a party to this appeal.

amend the complaint a fourth time and entered judgment in favor of Hathaway.

Hernandez and Noah's siblings (appellants) contend the trial court erred in sustaining the demurrer and denying leave to amend. They contend the allegations in the TAC and reasonable inferences therefrom establish a chain of causal connection between Hathaway's negligence and Noah's death. We agree and reverse the judgment of the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Factual Allegations

Appellants make the following factual allegations in the TAC, which they filed after the court sustained Hathaway's demurrers to their original, first amended, and second amended complaints with leave to amend. We must accept these allegations as true for purposes of this appeal. (See *Matthews v. Becerra* (2019) 8 Cal.5th 756, 761-762.)

Noah was removed from his mother's care when he was six months old, "due to his mother being arrested and under investigation for fracturing the skull of" her infant sister, Noah's maternal aunt. Noah's mother was convicted of a felony as result of this incident, and Noah was placed with Hernandez for approximately six months before being returned to his parents' care.[2]

In November 2016, the dependency court declared Noah a dependent based on allegations that he was failing to thrive in

---

[2]     The TAC later alleges that Noah "was in protective custody from August 2014 to May 2015." It is unclear why Noah was placed in out-of-home care rather than with his father at this time.

3

his parents' care; DCFS also received a report "at one point" that Noah was malnourished. The dependency court awarded Hernandez custody of Noah and granted his parents monitored visitation. On August 28, 2017, the dependency court found Noah's parents were making progress toward reunification and liberalized their visitation to unmonitored.

At a review hearing in November 2017, the dependency court further liberalized the parents' visitation to include unmonitored overnight visits with Noah and set the next review hearing for May 29, 2018. Prior to the May 29, 2018 hearing, Noah's social worker reported that Noah was healthy and thriving in Hernandez's care but was very resistant to visits with his parents, which he "hated." "Before each visitation with his parents, Noah increasingly cried, repeatedly refused to go with his parents, and yelled and clung to" Hernandez. Noah's social worker found a moderate safety risk in returning Noah to his parents' home; DCFS wanted to further assess his parents' ability to provide an appropriate level of care and stability for him.

At the May 29, 2018 review hearing, the dependency court "mandated that DCFS refer Noah and his parents to mental health services" by ordering "(1) DCFS to provide age-appropriate mental health services to Noah and (2) both parents and Noah to undergo 'conjoint counseling.'"[3] DCFS retained and paid Hathaway, "a mental health and welfare agency that provides

---

[3] The trial court ultimately took judicial notice of the May 29, 2018 order, which Hathaway represents only directs DCFS to refer Noah and his parents to appropriate services, not to provide them. The May 29, 2018 order is not in the appellate record.

4

behavioral services to dependent minors," to provide the court-ordered services.  Pursuant to its contract with the County, Hathaway promised to provide psychological counseling and family support services, using qualified, licensed, and supervised staff.

At the time it was retained, Hathaway knew that Noah had been removed from his parents' home because he was not safe in their custody due to physical, verbal, sexual, and severe emotional abuse.  It also knew that Noah's mother had been charged with and convicted of physically abusing her infant sister in August 2014, and his father "had a previous gang affiliation, had a criminal record that included a loaded firearm conviction, had a history of substance abuse and was a 'current abuser of marijuana' that had rendered him in mid-2014 as incapable of providing regular care and supervision of Noah."  Hathaway knew that allegations that Noah's parents generally neglected and abused him had been substantiated in October 2016.

Hathaway knew that Noah had received various medical diagnoses, including "'failure to thrive, gross motor development delays, feeding problems, sickle cell trait, and hypotonia.'"  His parents had failed to take him to eight scheduled medical appointments, and he had been malnourished.  Hathaway also knew that Noah had difficulties forming a positive attachment to his parents and expressed a strong desire not to live with them.  Noah refused to go with his parents, experienced mood and behavioral issues only prior to overnight visits, had toileting problems only during overnight visits, needed time to cry and calm down before visits, and sometimes was inconsolable and had to be carried to the car for the visits.  In its intake profile, the

date of which the TAC does not specify,[4] Hathaway noted, "'Noah qualifies for Adjustment Disorder with anxiety as evidenced by the following symptoms in relation to separation from maternal great grandmother [Eva Hernandez] when having visitation with parents; increased crying, [sic] repeatedly requesting not to go with parents; repeatedly requesting to stay with his great grandmother; refusal to go with parents, yelling and clinging to great grandmother.'"

Despite its awareness of the above and terms of its contract with DCFS, Hathaway assigned an unlicensed and unqualified intern or trainee with an art therapy background and "almost no training in child psychology" to Noah's case. The TAC alleges the trainee "never completed an assessment of Noah," "provided no therapy to Noah," "did nothing to help Noah," and "did not come close to complying with the May 29 order." It further alleges that Hathaway neglected to supervise the trainee or review her notes; it is unclear who assessed Noah and diagnosed him with adjustment disorder.

According to the TAC, the trainee met with Hernandez and Noah "four or five times between June 6, 2018 and October 25, 2018." During a meeting on October 5, 2018 Hernandez told the trainee that Noah was happy and thriving at her house but strongly resistant to visiting his parents. The TAC alleges Noah met the "medical necessity" requirement for treatment on that date.

Noah and Hernandez saw the trainee on October 11 and 15, 2018. Hernandez again reported that Noah behaved

---

[4]     Appellants' counsel asserted during oral argument that Hathaway diagnosed Noah in June 2018.

6

appropriately until he had to leave for visits with his parents. He then suffered mood swings and "intensified behaviors" including "crying, yelling, [and] ignoring request[s]." The trainee conducted no therapy. On October 25, 2018, Hernandez told the trainee there was ongoing stress in her home due to an upcoming court date at which Noah might be returned to his parents. Noah wanted to stay with Hernandez and "'only becomes significantly upset when he thinking [*sic*] he has to go with parents.'" The trainee never spoke to Noah's parents or his social worker.

By October 29, 2018, the trainee, whose notes were not reviewed or approved by a licensed therapist, "negligently formed the incompetent opinion that Noah lacked any medical necessity for individual therapy." The TAC alleges she reached this conclusion even though she "knew or should have known" the following: she lacked the education, training, or experience to reach such a conclusion; Hathaway had agreed but failed to provide court-ordered therapy to Noah; "Noah had a long and serious history of trauma, abuse, and neglect by his parents"; "Noah's resistance to visiting his parents had, if anything, worsened since May 29," and nothing had improved since he was diagnosed with attachment disorder with anxiety; "[t]he dependency court would interpret this negligent opinion as showing Noah and his parents made progress because of court-ordered services, moving from 'medical necessity' to 'no medical necessity'"; "[t]he dependency court had a statutory obligation to pursue family reunification before any other permanency planning"; "[t]he dependency [court] would, based on this unqualified and incompetent opinion, likely return Noah to his parents"; and "[i]t was not safe to return Noah to his parents." It

7

further alleges that Hathaway "knew of the abuse and neglect taking place during Noah's weekend visits with his parents."

On October 29, 2018, the trainee relayed her opinion to Hernandez and said "there was nothing more [she] could do for Noah." Hernandez "foreseeably reported the negligent opinion to Noah's social worker and asked the social worker to contact [the trainee]. The social worker foreseeably reported the negligent opinion to the dependency court." The trainee also told Noah's dependency court attorney that Noah lacked any medical necessity for therapy, an opinion she reiterated after the attorney told her that Noah was thriving in Hernandez's care, Noah vigorously resisted visiting his parents, and Noah's mother was trying to get custody of him. Neither the trainee nor Hathaway made any written reports to anyone, and the trainee did not tell Noah's attorney or the dependency court that she had not provided therapy or contacted Noah's parents.

Prior to the November 1, 2018 hearing, DCFS determined that Noah should not be returned to his parents; it recommended for the first time that the dependency court terminate family reunification services. At the hearing, however, the dependency court relied on the trainee's opinion, reasonably and foreseeably inferred that Noah's therapy goals had been met, and decided Noah should be returned to his parents over DCFS's objection. The court did not immediately return Noah due to a defect in the notice of the proceedings; it continued the hearing to November 9, 2018. In the interim, it "gave custody of Noah to his parents on an extended visitation release, with the expressed intent to return custody fully at the next hearing."

On November 2, 2018, Hernandez told the trainee that the dependency court had returned Noah to his parents' custody.

8

Hernandez also told her that Noah "had experienced increased stress, sadness, anxiety, and Noah cried in Ms. Hernandez's lap for at least an hour before leaving court with his mother." After learning this information, and that the dependency court intended to grant custody to Noah's parents on November 9, 2018, neither the trainee nor Hathaway did anything "to provide full, accurate information to the Court or to change the negligent opinion of 'no medical necessity.'"

On November 6, 2018, Noah's social worker told the trainee that DCFS wanted Noah to be placed with Hernandez. The trainee "repeated the false narrative that Noah met no medical necessity for individual treatment" and failed to further communicate with the dependency court. The TAC further alleges that on November 6, 2018, the trainee "spoke with an unidentified social worker," whom she "failed to tell . . . that Noah had an initial diagnosis of adjustment disorder with anxiety, Noah had not received any therapy, no conjoint therapy had occurred, and Noah greatly feared his parents. Instead, [she] negligently repeated her false narrative that Noah did not have any medical need for individual treatment." On November 12, 2018, Hernandez told the trainee how upset Noah was about being returned to his parents and asked for help on how to support Noah. The trainee "continued to believe that Noah had no medical need for therapy and just suggested family therapy for Noah and his parents." Hathaway did not provide family therapy. The trainee spoke to Noah's mother only once, at most, and never attempted to contact Noah's father. The trainee did not report to Noah's dependency court attorney or the dependency court that Noah's parents refused to participate in family therapy, despite knowing that "parents' failure to respond

9

to court-ordered services is a factor the court can consider in deciding not to return a child to his parents." Hathaway and the trainee "create[d] the misimpression that Noah and his parents were progressing toward reunification, when in fact the family problems remained the same or worsened during this time frame." The trainee unilaterally closed Noah's case file on December 17, 2018.

In or about February 2019, a DCFS caseworker noted that Noah appeared lethargic and withdrawn. DCFS received three referrals regarding Noah in March and April 2019, including a report that Noah arrived at a hospital with bruises on his back. On or about May 13, 2019, "reports were made" that Noah's father "had an alcohol problem and allegedly kicked Noah and his other minor children while out in public." Around the same time, DCFS "learned of allegations that Noah had been sodomized and had injuries to his rectum consistent with sexual abuse."

On or about May 15, 2019, a DCFS caseworker filed a petition to remove Noah from his parents' custody. The petition was granted on or about the same day, but DCFS "willfully ignored" it and did not remove Noah or ensure he received various examinations also mandated by the order. DCFS also "failed to warn or notify Ms. Hernandez of the May 2019 hearing." On or about June 18, 2019, DCFS prepared a "structured decision making assessment" for Noah in which it noted "'current concerns for the mother's mental health'" and indicated that Noah was at "very high" risk. Noah's parents remained his legal guardians.

On or about July 5, 2019, Noah's parents called 911 to report that Noah was drowning in a swimming pool. An ambulance rushed Noah to the hospital, where he was

pronounced dead. Hospital staff "found signs of trauma on Noah's body and determined there were issues and irregularities with his parents' explanation for his cause of death." Former County Sheriff Alex Villanueva also stated that Noah's injuries were not consistent with his parents' claims. Noah's parents have been charged with murder and torture in connection with his death.

Following Noah's death, then-DCFS director Bobby Cagle stated, "'This death happened on my watch. I fully accept the responsibility for the work that was done. I also fully accept responsibility for understanding what went wrong, what we can do better, and to implement that as quickly as possible.'" However, DCFS social workers "made threats against Evangelina Hernandez in an attempt to silence her," specifically threatening that if she "made any public statements about Noah's case and/or potential lawsuits, she would not only lose her request for guardianship of her great-grandchildren[, Noah's siblings] A.C., E.C., and R.C., but that she would never see these great-grandchildren again."

## II. Causes of Action Against Hathaway

In the fourth cause of action for wrongful death—negligence, Noah's siblings, by and through Hernandez, incorporate the preceding allegations. They further allege that Hathaway "agreed to carry out the dependency court's May 8, 2018 [*sic*] order and to follow its contract with DCFS." They allege Hathaway accordingly owed Noah a duty "to use the skill and care that a reasonably careful child service agency would have used in circumstances similar to the above." They allege Hathaway breached its duties "by, among other things, failing to provide any therapy to Noah and failing to provide any conjoint

11

counseling to Noah and his family between June 2018 and December 17, 2018, when [it] unilaterally closed its file without notifying the court." They further allege Hathaway breached its duties "by communicating the false information that Noah was not medically qualified to receive any therapy and there was nothing more that [Hathaway] could do to help Noah."

Noah's siblings allege Hathaway's "negligent failure to provide therapy and failure to communicate accurate information to the dependency court proximately caused Noah C.'s death and Plaintiffs' resulting injuries and damages, because among other things, the negligent breaches substantially contributed to the dependency court's decision to give custody of Noah to his parents, and leave Noah with his parents, resulting in Noah's death." They further allege Hathaway's negligence deprived them and will continue to deprive them of "the life-long companionship, comfort, society, and care of Noah C., protection, affection, moral support, guidance."

In the fifth cause of action, survival action—negligence, Noah's siblings, as successors in interest to his estate, also incorporate their previous allegations and make substantively identical allegations regarding Hathaway's duty and breach. They allege that as a direct and proximate result of Hathaway's negligence, Noah and his estate "suffered injuries including, but not limited to, physical and mental pain and suffering, physical injuries, costs in medical care and treatment, and lost wages."

III. **Demurrer**

Hathaway filed a demurrer to the TAC and the fourth and fifth causes of action "both generally and specially" on the grounds that the TAC "fails to state facts sufficient to constitute these causes of action against this moving defendant." In its

12

memorandum of points and authorities, Hathaway asserted that its involvement with Noah and his family ended when it last saw Noah in October 2018, and appellants' allegations failed to support their claim that Hathaway was responsible for the dependency court's decision to return Noah to his parents in November 2018 or Noah's death in July 2019.

Hathaway argued that appellants failed to state a claim for several reasons. First, it contended that even if Hathaway were responsible for the dependency court's decision to return Noah to his parents, it is "a stretch of logic for plaintiffs to suggest that [Hathaway] is liable for everything that happened to Noah thereafter, including Noah's death eight months later." It emphasized that Noah and his parents had been engaging in unmonitored visitation for a year prior to November 2018, implying that Noah's parents had unfettered access to him long before Hathaway became involved in the case. Second, it argued that the TAC did not contain facts alleging that Hathaway was responsible for the dependency court's decision to return Noah, because appellants did not allege that Hathaway or the trainee made any representations to the dependency court that Noah should be returned to his parents. Here, it quoted one of the trial court's previous rulings: "Even if the dependency court was told that 'all court-ordered therapy had been completed,' that does not come close to suggesting that decedent should be returned to his parents." Third, and relatedly, Hathaway argued that the only information the dependency court had regarding Noah's therapy was "third-hand hearsay regarding the 'falsely positive statement' that [the trainee] concluded that Noah did not need individual therapy." It asserted that appellants "cannot have it both ways": if the dependency court's decision was substantially

13

based on Hathaway's opinions, then it would not have made a decision about his custody without receiving an official opinion from Hathaway.

Fourth, Hathaway argued that it did not violate a court order to provide therapy because the relevant May 29, 2018 order only directed DCFS to refer Noah to therapy and did not direct Hathaway to communicate with the dependency court or provide a written report. Hathaway requested the trial court take judicial notice of the dependency court's May 29, 2018 order. It also asserted that appellants failed to make any allegations "that the dependency court was ever told anything regarding the conjoint therapy." Finally, it contended that the trainee's statements about Noah's lack of a need for therapy to Hernandez and Noah's dependency court attorney "had absolutely nothing to do with whether it was safe for Noah to be returned to his parents."

## IV. Opposition and Reply

Appellants opposed both the demurrer and Hathaway's request for judicial notice  As relevant here, appellants contended their allegations regarding the factual issue of causation were sufficient to survive Hathaway's demurrer. They argued that Hathaway's negligence was more than negligible or theoretical, and therefore constituted a substantial factor in causing Noah's death. They asserted that the dependency court "understood that reunification would not occur until Noah's [*sic*] ended his strong resistance to visitations" and ordered individual and conjoint therapy for Noah because it "wanted Noah to feel better about being in his parent's [*sic*] home." They continued, "the dependency court held a review hearing to see whether Noah still hated visiting his parents," and "expected someone to report on

14

whether Noah and his parents had gone to therapy and whether their relationship had improved as a result. [Hathaway] knew the court expected information on whether services had been provided and whether the family had made progress towards reunification."

Appellants further argued that Hathaway should have reported to the dependency court that it assigned the case to an unqualified trainee, did not provide therapy to the family, and Noah "still had the same or worse adjustment disorder issues." Appellants argued such a report would have been consistent with DCFS's recommendation to terminate reunification services, and the dependency court "likely would have agreed with DCFS and would not have returned Noah to his abusive parents since nothing had improved." Instead, appellants asserted, Hathaway indirectly reported to the dependency court that Noah had no need for therapy, "which the court reasonably but wrongly interpreted as Noah no longer resists visiting his parents." They contended Hathaway's opinion thus was "pivotal" to the court's decision to return Noah to his parents, and Hathaway "could foresee that its stupid opinion would be conveyed to the court."

Appellants further argued that Hathaway's arguments lacked merit. They stated that Hathaway improperly disputed the truth of their factual allegations, offered "unlikely alternative inferences to those that plaintiffs drew from the facts," ignored "key allegations," and improperly relied on the affirmative defense of superseding causation.

Hathaway filed a reply in support of the demurrer. It reiterated its previous arguments and emphasized that Noah's parents "had access to Noah regardless of the Dependency Court's Order in November 2018."

## V.  Hearing and Ruling

The trial court heard the demurrer on December 14, 2021. During the hearing, appellants' counsel argued that Hathaway's opinion that Noah lacked a medical need for therapy was "the only contrary information" to DCFS's recommendation that reunification services be terminated, and it was foreseeable that conveying that opinion to Hernandez and Noah's attorney would put that opinion before the dependency court.  After appellants' counsel conceded that Noah had been visiting his parents throughout the case, the court asked what the connection was between the November 2018 order and Noah's parents' access to him.  The court observed that the dependency court was not "deciding something conclusive.  It was whether or not potentially there would be more hours to allow that child to see the parents, but there wasn't anything . . . that the court can see, with any facts you've alleged, that there's some sort of legal or proximate cause of what anyone from Hathaway did that led to Noah's death."  Appellants' counsel responded that the dependency court relied on Hathaway's opinion to conclude reunification was warranted because Noah had improved, and would not have ordered reunification if it had known the truth. Counsel asserted, "if the reunification efforts stop on November 1, there's no more visitation.  There's no more exposure to the danger."

The court asked Hathaway's counsel whether the trainee had opined about whether Noah should reunify with his parents. Hathaway's counsel said she did not.  Hathaway's counsel also argued that causation was lacking because "[t]he question is, was it safe to return Noah to his parents, and my client had nothing to do with that," and emphasized that Noah's parents had access

16

to him through unmonitored visitation even before the November 2018 order. Appellants' counsel agreed that Hathaway did not opine that it was safe to return Noah, but asserted that Hathaway's representation that he did not need therapy "inferentially says Noah has changed," and "without that, the judge has nobody suggesting that Noah should go back to his parents." Appellants' counsel also argued that the only way Hathaway's role could be "irrelevant is if the subsequent events are supervening causes," which he asserted was a fact issue not appropriate for resolution by demurrer. The court took the matter under submission.

The court issued a written order sustaining the demurrer on January 14, 2022.[5] It concluded the TAC "failed to allege facts that would support a conclusion that any alleged negligence by Defendant Hathaway was the *legal or proximate* cause of decedent's death." The court found that the TAC alleged Hathaway told Noah's dependency court attorney he did not need therapy, and "then alleges, without any additional allegations providing for a reasonable inference, that the dependency court had knowledge of such statement when it made its order to return decedent to his parents." The court continued, "the allegations fail to allege that [trainee] or Defendant Hathaway represented to DCFS or the dependency court that decedent should be returned to his parents. Furthermore, if taken as true for purposes of this Demurrer that [trainee] made false

---

[5] The court also granted Hathaway's request for judicial notice of the May 29, 2018 dependency court order. It denied the request for judicial notice of a status report DCFS filed in advance of the May 29, 2018 hearing.

17

representation [*sic*] to the dependency court that contributed to the court's decision to return decedent to his parents, the court's decision and decedent's death (which took place approximately eight months later) are so attenuated to the allegations pertaining to [trainee] that Plaintiffs cannot assert that Defendant Hathaway's conduct was a legal factor in decedent's death." The court also stated that the allegations in the TAC demonstrated "there were several events that took place between the November 2018 hearing and decedent's death, which were substantial factors in decedent's death," and "there are no allegations that Defendant Hathaway had any knowledge or suspicion of any abuse/neglect suffered by decedent after he stopped receiving services from it or that they violated any of the court's order(s)."

The court denied leave to amend the TAC. It found that appellants did not and could not meet their burden of showing a reasonable possibility that the defects in the TAC could be cured by further amendment. It reiterated that there were no allegations that Hathaway told the court Noah did not need services or had knowledge or suspicion that Noah's parents were abusing him after he reunified with them. The court added that "even if that was the case, there are no allegations that this information caused the dependency court to order reunification between decedent and his parents," and "even if the dependency court had relied on the alleged information that no services were to be provided to decedent, Plaintiffs do not and cannot allege sufficient facts to demonstrate that this decision was a substantial factor in the horrific death of this young boy. To that end, such attenuated allegations as set forth in the TAC,

temporally separated and extremely attenuated, cannot survive demurrer."

The court entered judgment in favor of Hathaway on January 26, 2022. Appellants timely appealed.

## DISCUSSION

### I. Legal Principles

#### A. Standards of Review

"Because the function of a demurrer is to test the sufficiency of a pleading as a matter of law, we apply the de novo standard of review in an appeal following the sustaining of a demurrer without leave to amend. [Citation.] We assume the truth of the allegations in the complaint, but do not assume the truth of contentions, deductions, or conclusions of law." (*California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 247.) We also assume the truth of all facts reasonably inferable from the facts alleged. (*Busse v. United PanAm Financial Corp.* (2014) 222 Cal.App.4th 1028, 1032-1033; *Neilson v. City of California City* (2005) 133 Cal.App.4th 1296, 1305.) We may affirm on any basis stated in the demurrer, regardless of the ground on which the trial court based its ruling. (*Summers v. Colette* (2019) 34 Cal.App.5th 361, 367.) We presume the judgment of the trial court is correct, and appellants bear the burden of affirmatively showing error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

We review the trial court's order denying leave to amend for abuse of discretion. We must decide whether there is a reasonable possibility appellants could cure the defect with an amendment. Appellants bear the burden of proving that an

19

amendment would cure the defect.  (*Modisette v. Apple Inc.* (2018) 30 Cal.App.5th 136, 155.)

### B.    Substantive Principles

The elements of a cause of action for negligence are a legal duty to use due care, a breach of that legal duty, and the breach as the proximate or legal cause of a resultant injury.  (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917.)  "'The elements of a cause of action for wrongful death are a tort—here, negligence, a resulting death, and damages consisting of pecuniary loss suffered by the decedent's heirs.'"  (*Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 968.)

Here we follow the parties' lead and focus on the element of causation.[6]  Causation is a fundamental requirement in a tort claim; damages cannot be recovered unless there is a causal connection between the act or omission complained of and the injury sustained.  (*McDonald v. John P. Scripps Newspaper* (1989) 210 Cal.App.3d 100, 104.)  California applies the "substantial factor" standard of causation, "a relatively broad one requiring only that the contribution of the individual cause be

---

[6]    Although it now argues that it had no legal duty to provide Noah with therapy, Hathaway failed to make any such argument in its demurrer below.  Though we may affirm an order sustaining a demurrer on a different basis than that relied upon by the trial court, such basis must have been raised in the demurrer.  (See *Summers v. Colette, supra,* 34 Cal.App.5th at p. 367.)

more than negligible or theoretical." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968, 978.)  The substantial factor standard is broader than and "subsumes the 'but for' test while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact." (*Id.* at p. 969.)  Accordingly, "[u]ndue emphasis should not be placed on the term 'substantial.'" (*Ibid.*)  "Even 'a very minor force' that causes harm is considered a cause in fact of the injury." (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 744.)

Causation ordinarily presents a question of fact for the jury.  (*Vasquez v. Residential Investments, Inc.* (2004) 118 Cal.App.4th 269, 278.)  It may be decided as a matter of law only where, "under undisputed facts, there is no room for a reasonable difference of opinion." (*Nichols v. Keller* (1993) 15 Cal.App.4th 1672, 1687.)  The same is true of the affirmative defense of superseding cause.  (*Green v. Healthcare Services, Inc.* (2021) 68 Cal.App.5th 407, 415 [superseding cause is an affirmative defense]; *Silva v. Langford* (2022) 79 Cal.App.5th 710, 716 [demurrer based on affirmative defense may be sustained only where the face of the complaint shows the defense necessarily bars the action].)

## II.  Analysis

Appellants contend that reasonable inferences drawn from the facts pleaded in the TAC "show a sufficient causal chain to permit the case to go to a trier of fact."  We agree that the TAC contains factual allegations sufficient to survive the demurrer.

Appellants allege that Noah's social worker reported "before the May 29[, 2018] hearing" that Noah "was very resistant" to visits with his parents, and cried, yelled, and clung

21

to Hernandez. They further allege that, after the hearing, the dependency court ordered "age-appropriate mental health services" for Noah and "conjoint counseling" for Noah and his parents. It is reasonable to infer that the dependency court ordered the counseling in response to the social worker's report, with a goal of improving Noah's experience with the visits and the family's ability to reunify. (See *In re Tania R.* (1995) 32 Cal.App.4th 447, 451 ["The purpose of dependency proceedings, when possible, is to reunify neglected or abused children with their parents under juvenile court supervision utilizing review hearings at six-month intervals."]; *In re M.R.* (2020) 48 Cal.App.5th 412, 424 ["the court cannot arbitrarily order services that are 'not reasonably designed' to eliminate the behavior or circumstances that led to the court taking jurisdiction of the child"].)

Appellants further allege that Noah was diagnosed with an attachment disorder shortly after being referred to Hathaway, yet was assigned to an unqualified trainee who failed to provide him with any treatment to improve or resolve the diagnosis. Instead, the trainee erroneously concluded Noah had no medical need for treatment, a conclusion she orally conveyed to both Hernandez and Noah's dependency attorney. Appellants also allege—and it is reasonable to infer—that it was reasonably foreseeable that either or both of those individuals would relay the report to the dependency court in connection with the upcoming review hearing. The dependency court is obligated to monitor family reunification plans (*In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1211); it is reasonably foreseeable the court would endeavor to comply with that obligation by inquiring about the progress of the therapy services it previously ordered.

Though Hathaway emphasizes the absence of a direct or written report to the court, it cites no authority holding that an informal or indirect report is improper in the dependency context. To the contrary, Noah's counsel was obligated to make recommendations to the court, and to advise the court of Noah's wishes. (See Welf. & Inst. Code, § 317, subd. (e).) It is reasonable to infer Noah's dependency attorney complied with this duty by notifying the court that Hathaway reported Noah no longer had a medical need for therapy, and that the court relied upon the information provided by an officer of the court.

Appellants also allege that Hathaway's assessment of Noah was the only positive information regarding Noah and his parents before the dependency court when it decided to reunify the family. It is therefore reasonable to infer that the dependency court gave at least some weight to Hathaway's opinion when it ordered Noah returned to his parents over the objection of DCFS. Hathaway did not need to opine expressly that Noah should be returned to his parents for the dependency court to reasonably conclude from its assessment that reunification was appropriate.

Hathaway argues here, as it did below, that its actions could not have played a causal role in Noah's death because he regularly had unsupervised visits with his parents prior to Hathaway's involvement in the case, giving them "opportunities to abuse, neglect, and murder" Noah. While this may be one reasonable inference, it is also reasonable to infer that Noah's parents minimized or curtailed their abuse of Noah while he was under court supervision and primarily in Hernandez's custody, escalating the abuse only after Noah was returned to their care and court supervision ceased. Appellants' allegations about the

23

repeated instances of abuse following Noah's return support the latter inference. We reiterate that "[e]ven 'a very minor force' that causes harm [may be] considered a cause in fact of the injury," particularly at the demurrer stage. (*Uriell v. Regents of University of California, supra*, 234 Cal.App.4th at p. 744.) The absence of allegations regarding the means by which Noah was killed does not compel an alternative inference.

Hathaway also contends that it cannot be held liable because "there were multiple reports of abuse/neglect against NOAH, which did not arise until three months after NOAH's return, culminating in an order for NOAH's immediate removal, which DCFS 'willfully ignored.'" This argument, which the trial court found persuasive, is essentially an assertion that intervening causes severed any link between Hathaway's conduct and Noah's death. The TAC sufficiently alleges causation, however. While a factfinder ultimately may agree, it is premature to dismiss the TAC at the demurrer stage on the basis of this affirmative defense. (See *Silva v. Langford, supra*, 79 Cal.App.5th at p. 716.) Appellants may proceed with their TAC.

## DISPOSITION

The judgment of the trial court is reversed. Appellants may recover their costs of appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

CURREY, ACTING, P.J.

24

STONE, J.*

---

*Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.